# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INTERNET MEDIA INTERACTIVE CORP.,<br><br>        Plaintiff,<br><br>   v.<br><br>SHOPIFY INC.,<br><br>        Defendant. | Case No. 20-416-MN |

**DEFENDANT'S OPENING BRIEF IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................... 1

II.    NATURE AND STAGE OF PROCEEDINGS .................................................. 2

III.   SUMMARY OF ARGUMENT ............................................................................. 3

IV.   STATEMENT OF FACTS ................................................................................... 4

V.    ARGUMENT ........................................................................................................... 6

     A.    Under Rule 12(b)(2), this Court should dismiss this case for lack of personal jurisdiction because Shopify has insufficient contacts with the State of Delaware. ................................................................................... 6

     B.    Under Rule 12(b)(5), the Court should dismiss this case for insufficient service of process because Shopify was never properly served. .......................... 11

     C.    Under Rule 12(b)(6), this Court should dismiss the complaint because IMI fails to state a claim upon which relief can be granted. ........................................ 13

          1.    IMI fails to properly allege a claim for infringement because the complaint lacks factual support for IMI's divided infringement theory. ...................................................................................................... 13

          2.    IMI fails to properly allege an act of infringement that occurred within the relevant time period, and thus, the claims must be dismissed. ................................................................................................... 15

          3.    IMI fails to allege a claim for infringement because the claims of the '835 patent are directed to patent-ineligible subject matter under 35 U.S.C. § 101. .................................................................................. 16

VI.   CONCLUSION ..................................................................................................... 19

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*3D Sys., Inc. v. Aarotech Labs., Inc.*,
    160 F.3d 1373 (Fed. Cir. 1998)..................................................................9

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    882 F.3d 1121 (Fed. Cir. 2018)................................................................16

*Adtile Techs. Inc. v. Perion Network Ltd.*,
    192 F. Supp. 3d 515 (D. Del. 2016).........................................................10

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
    797 F.3d 1020 (Fed. Cir. 2015)....................................................3, 13, 14

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    573 U.S. 208 (2014)......................................................................3, 16, 18

*Artrip v. Ball Corp.*,
    735 F. App'x 708 (Fed. Cir. 2018) .....................................................13, 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................13

*Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*,
    566 F.3d 1012 (Fed. Cir. 2009)..................................................................7

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016)................................................................19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................................13

*Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*,
    444 F.3d 1356 (Fed. Cir. 2006)........................................................8, 9, 10

*In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*,
    2006 WL 1084093 (D.N.J. Apr. 24, 2006) .............................................12

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)................................................................................8

*Celgard, LLC v. SK Innovation Co., Ltd.*,
    792 F.3d 1373 (Fed. Cir. 2015).................................................................6

*Chalumeau Power Sys. LLC v. Alcatel-Lucent*,
　　2012 WL 6968938 (D. Del. Sept. 24, 2014) ....................................................13

*Daimler AG v. Bauman*,
　　571 U.S. 117 (2014) ..............................................................................8, 9

*DDR Holdings, LLC v. Hotels.com, L.P.*,
　　773 F.3d 1245 (Fed. Cir. 2014) ..................................................................18

*Elec. Power Grp. v. Alstom S.A.*,
　　830 F.3d 1350 (Fed. Cir. 2016) ..................................................................17

*Girafa.com, Inc. v. Smartdevil Inc.*,
　　728 F. Supp. 2d 537 (D. Del. 2010) ............................................................12

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
　　564 U.S. 915 (2011) .................................................................................8

*Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*,
　　988 F.2d 476 (3d Cir. 1993) ......................................................................11

*Indep. Film Dev. Corp. v. Junior Capital Inc.*,
　　2015 WL 12778352 (C.D. Cal. July 9, 2015) .................................................12

*Int'l Bus. Machs. Corp. v. Booking Holdings Inc.*,
　　775 F. App'x 674 (Fed. Cir. 2019) ..............................................................13

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
　　850 F.3d 1332 (Fed. Cir. 2017) ..............................................................17, 18

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
　　566 U.S. 66 (2012) .................................................................................16

*Med. Sols., Inc. v. C Change Surgical LLC*,
　　541 F.3d 1136 (Fed. Cir. 2008) ...................................................................7

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
　　811 F.3d 1314 (Fed. Cir. 2016) ..................................................................18

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*,
　　526 U.S. 344 (1999) ...............................................................................11

*New World Int'l, Inc. v. Ford Glob. Techs., LLC*,
　　859 F.3d 1032 (Fed. Cir. 2017) ...................................................................7

*NexLearn, LLC v. Allen Interactions, Inc.*,
　　859 F.3d 1371 (Fed. Cir. 2017) ...................................................................8

*Quantum Loyalty Sys., Inc. v. TPG Rewards, Inc.*,
  2009 WL 5184350 (D. Del. Dec. 23, 2009)................................................................7

*Reach & Assocs., P.C. v. Dencer*,
  269 F. Supp. 2d 497 (D. Del. 2003)......................................................................8

*Samish Indian Nation v. United States*,
  419 F.3d 1355 (Fed. Cir. 2005)..........................................................................7

*Touchcom, Inc. v. Bereskin & Parr*,
  574 F.3d 1403 (Fed. Cir. 2009).......................................................................7, 8

*TrackTime, LLC v. Amazon.com, Inc.*,
  2019 WL 2524779 (D. Del. June 19, 2019)............................................................19

*TriDiNetworks Ltd. v. NXP USA, Inc.*,
  2020 WL 2220152 (D. Del. May 7, 2020)........................................................7, 9, 10

**Statutes**

8 Del. C. § 321(a)..............................................................................................12

10 Del. C. § 3104(c)...........................................................................................7

35 U.S.C. § 101.................................................................................................16

35 U.S.C. § 286.................................................................................................15

**Rules**

Fed. R. Civ. P. 4(e)(1).........................................................................................11

Fed. R. Civ. P. 4(f)(1).........................................................................................12

Fed. R. Civ. P. 4(h)(1).........................................................................................11

Fed. R. Civ. P. 4(h)(2).........................................................................................12

Fed. R. Civ. P. 12(b)(2).........................................................................................6

Fed. R. Civ. P. 12(b)(5).......................................................................................11

Fed. R. Civ. P. 12(b)(6).......................................................................................13

Reiter Decl. Ex. 1 p. 005

## I.    INTRODUCTION

Over the past fifteen years, the now expired, asserted patent—U.S. Patent No. 6,049,835 ("the '835 patent")—has been the subject of seventy-five (and counting) separate cases.  With this lawsuit, Defendant Shopify Inc. ("Shopify") has become one of the latest victims in Plaintiff Internet Media Interactive Corporation's ("IMI") scheme to squeeze some last bit of juice out of this dried up turnip.  The lack of any value in the patent is evidenced by the little effort IMI puts into its scheme: IMI simply reuses the same standard complaint, while ignoring the basic requirements of personal jurisdiction and service of process—both of which are absent here.

The infringement allegations underlying that scheme do not address the business, products or services of the defendant; rather, the allegations solely depend on the defendant's use of Twitter.  Indeed, including this case against Shopify, IMI has alleged that a defendant's use of Twitter infringes the '835 patent in sixty-one cases.  And given that focus, IMI's complaint against Shopify mirrors the fifty-two most recent complaints filed by IMI.  *See, e.g.*, Reiter Decl., Exs. 3–5.

Because IMI has simply refashioned its standard complaint, IMI includes nothing more than rote, conclusory allegations of personal jurisdiction, alleging only that Shopify conducts business in Delaware and has thereby established sufficient minimum contacts.  But IMI identifies no facts that support these conclusions, and, indeed, none exist.  As the complaint correctly notes, Shopify is a Canadian corporation with its principal place of business in Canada.  Shopify owns no property in Delaware, has no employees in Delaware, and has not directed any acts of alleged infringement at Delaware citizens.  This Court lacks personal jurisdiction over Shopify.

Being a copy of the most recent fifty-two complaints, the complaint against Shopify also ignores other basic requirements.  First, the complaint fails to allege any facts that suggest Shopify, either alone or with others, allegedly infringed prior to the expiration of the '835 patent—August 30, 2016.  This failure is fatal.  Next, while IMI asserts that Shopify infringes the '835 patent alone

Reiter Decl. Ex. 1 p. 006

or based on the action of others, the complaint fails separately to support these two different legal theories with facts that make each theory of liability plausible.  As to infringement "alone," IMI provides no allegations that Shopify alone infringes—the minimal allegations IMI does provide all depend on the acts of others.  And as to infringement "based on the action of others," *i.e.,* divided infringement, IMI fails to support its allegations with any facts that suggest Shopify directs and controls the actions of those who might read Shopify's Twitter post or that those who read Shopify's Twitter posts form a joint enterprise with Shopify.  Simply citing to a couple of Federal Circuit cases does not suffice.

Like the complaint, the '835 patent itself is also defective—the patent's claims cover subject matter not eligible for patenting.  The '835 patent claims are directed to the abstract idea of compiling information to access web content; the claims, moreover, recite nothing more than implementing the abstract idea on generic computer technology.  Because IMI has alleged no facts pointing to anything in the claims that constitute an inventive concept, the claims are thus directed to patent-ineligible subject matter and cannot form the basis of an infringement claim.

Finally, aside from the numerous deficiencies in the complaint and with the asserted patent, IMI also failed to properly serve Shopify with the defective complaint.  Shopify notified IMI of the deficiency, as did CT Corporation.  Yet, even after these repeated notices, IMI took no steps to effectuate service.

IMI's careless efforts should not be rewarded.  Respectfully, Shopify requests, pursuant to the Federal Rules of Civil Procedure 12(b)(2), 12(b)(5) and 12(b)(6), that the Court dismiss IMI's complaint with prejudice.

## II.    NATURE AND STAGE OF PROCEEDINGS

On March 25, 2020, IMI filed its complaint against Shopify alleging that Shopify's use of Twitter or other unnamed online media infringes at least claim 11 of the '835 patent.  *See* Compl.

2

(D.I. 1).  On March 27, 2020, CT Corporation, which IMI had attempted to serve on Shopify's behalf, notified IMI that it was not the registered agent for Shopify and could not receive service of process.  *See* Reiter Decl, Ex. 1.  On April 9, 2020, counsel for Shopify also notified counsel for IMI that Shopify had not been served.  *See* Reiter Decl., Ex. 2.

### III.    SUMMARY OF ARGUMENT

1.    Dismissal is required under Rule 12(b)(2) because this Court lacks personal jurisdiction over Shopify, which is a Canadian corporation having its principal place of business in Canada.  Shopify owns no property and has no employees in Delaware.  Thus, general personal jurisdiction is lacking.  Furthermore, IMI fails to allege any acts specifically directed at Delaware that gave rise to the claims in its complaint such that specific personal jurisdiction is present.

2.    Shopify has not been properly served domestically or outside the United States in accordance with Rules 4(f) and (h).  Dismissal is therefore required under Rule 12(b)(5).

3.    This Court should also dismiss the complaint under Rule 12(b)(6) because it fails to properly plead a claim for which relief can be granted.

- IMI's bare and conclusory allegations that Shopify is liable for direct infringement because it directs and controls the actions of the end users are supported by no facts and thus do not properly plead a claim for infringement under *Akamai. See Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022–23 (Fed. Cir. 2015) (en banc).

- Because it asserts an expired patent, IMI's complaint must allege an act of infringement that occurred prior to the patent's expiration in August 2016.  No such allegation appears in the complaint.

- The claims of the '835 patent are directed to patent-ineligible subject matter under 35 U.S.C. § 101.  Claim 11, which IMI appears to assert as the representative claim, is directed to the abstract idea of publishing a collection of information and accessing web content using generic computer technology.  IMI fails to allege any inventive concept that would transform the abstract idea into patent-eligible subject matter.  *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014).

Thus, for all these reasons, this Court should dismiss IMI's complaint with prejudice.

3

## IV.    STATEMENT OF FACTS

Shopify is a corporation organized under the laws of Canada, with its principal place of business in Canada, that provides e-commerce platforms used to power the websites of merchants, primarily small- and medium-sized businesses who operate online storefronts.  Hartman Decl. (Ex. 1) ¶ 2; *see also* Compl. ¶ 5.  Shopify does not own any properties in Delaware, and all of its employees, including its corporate officers, reside and work in Canada.  Hartman Decl. ¶ 3. Shopify is not registered to do business in Delaware and does not have a bank account in Delaware. *Id.*  ¶ 6.    Shopify  has  a  website  ([www.shopify.com](www.shopify.com)),  which  provides  information  and advertisements regarding its various e-commerce products and services, but that website is not directed at Delaware; rather, it is generally available to the public.  *Id.* ¶ 4.  While potential customers may sign up for a trial account, that does not require a credit card.  *Id.*  Should a customer later upgrade to a paid plan, it occurs outside of the website.  *Id.*  The Shopify website is not managed in Delaware, but by Shopify employees in Canada.  *Id.*

Shopify's e-commerce business and website, however, are irrelevant to this case.  Indeed, IMI makes no claims against Shopify's website, products or business.  Instead, IMI has alleged that Shopify's use of *Twitter*, which is unaffiliated with Shopify or Shopify's website, constitutes the alleged infringement.  More specifically, as it has done in the sixty other cases, IMI asserts Shopify infringes because Shopify has a *Twitter* account and that visitors to Shopify's *Twitter feed*, *i.e.,* "compilations of various information," are able to access "preselected locations" on *Twitter*.  Compl. ¶ 12.  Twitter merely allows Shopify to post information; Shopify does not sell any products through Twitter.  Hartman Decl. ¶ 5.  Shopify's use of Twitter, and the availability of Shopify's Twitter posts throughout the world, in no way establishes Shopify's minimum contacts with the State of Delaware.  Thus, Shopify does not "own[], operate[] and conduct[] business in the state of Delaware," does not "direct[] advertisements at residents of Delaware,"

4

and has not "purposefully availed itself" to Delaware such that it should "reasonably and fairly anticipate being haled into court in Delaware." *But see* Compl. ¶¶ 8–10.

The '835 patent, which expired on August 30, 2016, claims systems and methods for compiling information used to access content on the Internet. *See* '835 patent (Compl. Ex. A), Abstract. Claim 11, which IMI appears to allege is representative, recites:

> A method for providing automatic access to preselected locations on the Internet, comprising the steps of:
>
> > publishing <u>a compilation of preselected Internet locations</u>, said published compilation including a <u>unique predetermined multi-digit jump code</u> assigned to each of said preselected Internet locations published therein;
> >
> > providing a predetermined Internet location having an address published in said published compilation, said predetermined Internet location comprising means for capturing a desired multi-digit jump code assigned to said preselected Internet location, said desired multi-digit jump code being entered by a user after said predetermined Internet location has been accessed;
> >
> > <u>accessing said predetermined Internet location and entering said desired multi-digit jump code into said predetermined Internet location;</u>
> >
> > receiving said multi-digit jump code entered into said predetermined Internet location after said multi-digit jump code has been captured at said predetermined Internet location;
> >
> > converting the received multi-digit jump code to a URL address corresponding to the desired preselected Internet location; and
> >
> > automatically <u>accessing said desired preselected Internet location</u> using said URL address corresponding to said desired preselected Internet location <u>corresponding to said received multi-digit jump code</u>.

*Id.* at 9:1–28 (emphasis added).

The claims of the '835 patent are no different than a telephone book, which provided a compilation of persons with their corresponding multi-digit telephone number, such that a caller could look up the person, enter the person's number on a telephone and thereby be connected to the person. Similarly, the claims of the '835 patent recite a "published compilation" of Internet locations, together with multi-digit "jump codes" corresponding to each Internet location, such that a user can look up the multi-digit code corresponding to an Internet location, enter the code on a website and thereby access the Internet location. In fact, just like a telephone book, the '835

Reiter Decl. Ex. 1 p. 010

patent teaches that its preferred embodiment includes a "printed publication which contains preselected Web sites . . . so that the jump codes associated with each of the preselected Web sites can be easily determined by the users." *See id.* at 5:50–54. Additionally, the '835 patent only teaches the use of generic technology—for example, "personal computer," "Web browser," "modem," "the Internet," "video monitor," "keyboard," and "mouse." *See id.* at 5:24–34.

As noted, IMI alleges that Shopify's use of Twitter "or other [unnamed] online medium" infringes at least claim 11 of the '835 patent "alone, or based on the actions of other[s]." *See* Compl. ¶ 12. IMI further alleges that the acts of third parties, Sprinklr and the end user, are attributable to Shopify with vague references to "promotional offerings." *Id.* ¶¶ 12–13. No other explanation is given. While IMI also alleges that "other online medium" infringes, it provides no additional facts and therefore Shopify is unable to determine what "other online medium" is accused. Additionally, as explained above, while Shopify's website and advertisements are mentioned in the complaint, *see id.* ¶ 6, IMI directs no allegations of infringement at either the website or advertisements.

## V.    ARGUMENT

**A.    Under Rule 12(b)(2), this Court should dismiss this case for lack of personal jurisdiction because Shopify has insufficient contacts with the State of Delaware.**

Rule 12(b)(2) allows a party to move to dismiss a case for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). The burden is on the plaintiff to prove that personal jurisdiction exists. *Celgard, LLC v. SK Innovation Co., Ltd.*, 792 F.3d 1373, 1378 (Fed. Cir. 2015) (stating that plaintiff bears initial burden of proving personal jurisdiction; if plaintiff can make the showing, defendant bears the burden of proving that the exercise of jurisdiction would be unreasonable). "In the procedural posture of a motion to dismiss, a district court must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in

the plaintiff's favor." *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1017 (Fed. Cir. 2009) (citation omitted).  The Court may consider "the pleadings, affidavits, declarations and exhibits" in reviewing a motion to dismiss for lack of personal jurisdiction.  *See TriDiNetworks Ltd. v. NXP USA, Inc.*, No. 19-cv-1062-CFC-CJB, 2020 WL 2220152, at *2 (D. Del. May 7, 2020).  However, the Court need only accept as true ***non-conclusory*** allegations of fact.  *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005); *Quantum Loyalty Sys., Inc. v. TPG Rewards, Inc.*, No. 09-cv-022-SLR-MPT, 2009 WL 5184350, at *5 (D. Del. Dec. 23, 2009) (rejecting "conclusory," "bald," and "unsupported statements" as sufficient to substantiate allegations of personal jurisdiction).

In patent cases, Federal Circuit law governs questions of personal jurisdiction.  *See New World Int'l, Inc. v. Ford Glob. Techs., LLC*, 859 F.3d 1032, 1037 (Fed. Cir. 2017).  The inquiry "involves two steps."  *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1411 (Fed. Cir. 2009). "First, jurisdiction must exist under the forum state's long-arm statute.  Second, the assertion of personal jurisdiction must be consistent with the limitations of the due process clause."  *Med. Sols., Inc. v. C Change Surgical LLC*, 541 F.3d 1136, 1139 (Fed. Cir. 2008).  Under the Delaware long-arm statute, the Court may exercise personal jurisdiction over any nonresident who

> (1) Transacts any business or performs any character of work or service in the State;
> . . .
> (3) Causes tortious injury in the State by an act or omission in this State;
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State.

10 Del. C. § 3104(c).  Shopify is a Canadian corporation with its principal place of business in Canada, not Delaware.  Hartman Decl. ¶ 2.  Shopify is not registered to do business in Delaware, does not own property in Delaware, does not have a bank account in Delaware, and has no

employees in Delaware such that it could be argued that Shopify performs any character of work or service in the State. *Id.* ¶¶ 3, 6.  IMI, moreover, has not pleaded that any of the alleged infringing acts occurred in Delaware.  Thus, Shopify does not fall within the purview of Delaware's long-arm statute, and the Court may dismiss for lack of personal jurisdiction on this ground alone.  *See Reach & Assocs., P.C. v. Dencer*, 269 F. Supp. 2d 497, 505 (D. Del. 2003).

Should the Court disagree, the Court must then "determine whether the assertion of personal jurisdiction in accordance with that long-arm statute would violate the U.S. Constitution's guarantee of due process." *Touchcom*, 574 F.3d at 1411.  "The Due Process Clause requires that there exist sufficient 'minimum contacts' such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1361 (Fed. Cir. 2006) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).  This test can be satisfied if the circumstances warrant either general jurisdiction or specific jurisdiction.  *See NexLearn, LLC v. Allen Interactions, Inc.*, 859 F.3d 1371, 1375–76 (Fed. Cir. 2017).  Neither general nor specific jurisdiction over Shopify exists in Delaware.

For general jurisdiction, a corporation's affiliations with the State must be "so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  As the Supreme Court explained, "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction."  *Id.* at 137.  For a corporation, "the place of incorporation and principal place are 'paradigm.'"  *Id.* (citation omitted).  Although not limited to only these places, the Supreme Court has held that "general jurisdiction in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business' .

. . is unacceptably grasping." *Id.* at 138. "A corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise, 'at home' would be synonymous with 'doing business' . . . ." *Id.* at 139 n.20.

Delaware cannot assert general jurisdiction over Shopify because Shopify is not incorporated in Delaware and does not have its principal place of business in Delaware. *See id.* at 138. Again, Shopify is a Canadian corporation with its principal place of business in Canada, as even the plaintiff acknowledges. *See* Compl. ¶ 5; Hartman Decl. ¶ 2. Shopify does not own any office space, real property, residence, or place of business in Delaware. Hartman Decl. ¶ 3. None of Shopify's employees work or reside in Delaware. *Id.* Shopify is not registered to do business in Delaware and does not have a bank account in Delaware. *Id.* ¶ 6. Shopify's e-commerce business is irrelevant to the general jurisdiction inquiry because the Supreme Court has rejected the notion that "doing business" is synonymous with being "at home." *See Daimler*, 571 U.S. at 138, 139 n.20. Thus, Shopify does not have contacts that are so continuous and systematic as to render it essentially at home in Delaware, and general jurisdiction in Delaware is absent.

For specific jurisdiction, the Federal Circuit employs a "three-prong test" that consists of determining whether: "(1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to those activities, and (3) assertion of personal jurisdiction is reasonable and fair." *Breckenridge Pharm.*, 444 F.3d at 1363. A defendant's ownership of a passive website, standing alone, does not suffice for purposeful availment. *See 3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1380 (Fed. Cir. 1998); *see also TriDiNetworks*, 2020 WL 2220152, at *4 (stating that a "passive" website does not suffice for purposeful availment). Advertisements that are not specifically directed towards the forum state are also

insufficient for purposeful availment.  *See Adtile Techs. Inc. v. Perion Network Ltd.*, 192 F. Supp. 3d 515, 522–23 (D. Del. 2016).

As it has done in sixty other cases, IMI focuses its claims on Shopify's ***Twitter feed***, which is a passive website not directed at Delaware residents, and thus does not meet the "purposefully directed" requirement under prong one.  *See Breckenridge Pharm.*, 444 F.3d at 1363.  Shopify posts information on its Twitter feed that it considers pertinent, and visitors to Shopify's Twitter feed cannot purchase anything from Shopify or conduct business with Shopify.  Hartman Decl. ¶ 5.  Rather, consistent with the resources Twitter provides, visitors are able to read what Shopify posts, and, provided they have a Twitter account, "reply to," "retweet," "like," or "share" Shopify's post.  None of this, ***which all occurs through Twitter***, is specifically directed at Delaware.  *Id.* Instead, through Twitter, Shopify "simply offers information to its users, whether they be in the United States or somewhere else around the world."  *See TriDiNetworks*, 2020 WL 2220152, at *4.  Moreover, the relevant Twitter posts were managed by Shopify employees in Canada.  Hartman Decl. ¶ 5.

Furthermore, the alleged wrongful acts—historical posts to Shopify's Twitter feed—do not arise out of Shopify's e-commerce business, and thus acts stemming from Shopify's e-commerce business are unrelated and cannot form the basis for specific jurisdiction, as required under prong two.  *See Breckenridge Pharm.*, 444 F.3d at 1363.  Thus, while IMI identifies Shopify's website and advertisements in one paragraph of the complaint (*see* Compl. ¶ 6), because IMI's claims do not arise out of or relate to Shopify's website or advertisements, but concern Shopify's ***Twitter feed***, which used ***Twitter's*** platform, IMI's identification of Shopify's website is irrelevant.  IMI also references "other online medium" (*see id.* ¶ 12), but because IMI offers no specifics, this reference cannot be used to support jurisdiction.  Regardless, Shopify's employees are all based in

10

Canada, and thus the relevant media activities were managed by employees in Canada.  Hartman Decl. ¶ 3.  In short, the alleged infringing acts have nothing to do with Shopify's e-commerce business, its website or advertisements, and are based on information passively provided through Shopify's *Twitter* feed, which is hosted by *Twitter*, and not directed to residents in Delaware.  Therefore, Shopify is not subject to specific jurisdiction in Delaware.

**B.**     **Under Rule 12(b)(5), the Court should dismiss this case for insufficient service of process because Shopify was never properly served.**

Rule 12(b)(5) allows a party to challenge service of process if that service of process does not comply with Rule 4.  *See* Fed. R. Civ. P. 12(b)(5).  Absent service, a court "ordinarily may not exercise power over a party the complaint names as defendant."  *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).  The plaintiff bears the burden of establishing the validity of service of process.  *See Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 488 (3d Cir. 1993).

Rule 4(h) sets forth the requirements for serving a corporation.  The Rule draws a distinction between domestic and foreign service.  Domestic service can be executed "in the manner prescribed by Rule 4(e)(1) for serving an individual," or by delivering a copy of the summons "to an officer, a managing or general agent, or any other agent authorized . . . to receive service of process."  Fed. R. Civ. P. 4(h)(1).  Rule 4(e)(1) authorizes service wherein the plaintiff "follow[s] state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made."  Fed. R. Civ. P. 4(e)(1).  Under Delaware law, service of process on a corporation

> shall be made by delivering a copy personally to any officer or director of the corporation in this State, or the registered agent of the corporation in this State, or by leaving it at the dwelling house or usual place of abode in this State of any officer, director or registered agent (if the registered agent be an individual), or at the registered office or other place of business of the corporation in this State.

Reiter Decl. Ex. 1 p. 016

8 Del. C. § 321(a).  IMI has not properly served Shopify under any of the methods allowed under Delaware law.  While IMI attempted service by leaving a copy of the summons with CT Corporation, CT Corporation is not Shopify's registered agent for service of process, as the March 27, 2020 service rejection letter CT Corporation provided to IMI stated.  *See* Ex. 2-1.  Consistent with CT Corporation's rejection of service, on April 9, 2020, counsel for Shopify notified counsel for IMI that it had not been served.  *See* Ex. 2-2.  To date, IMI has done nothing further to effectuate proper service, nor has IMI requested that Shopify waive service pursuant to Rule 4(d).  Reiter Decl. (Ex. 2) ¶ 4.

Alternatively, service of a corporation outside the United States may be performed "in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)."  *See* Fed. R. Civ. P. 4(h)(2).  If the foreign country in which service is to take place is a signatory to the Hague Convention or similar international agreement, then that agreement controls.  *See* Fed. R. Civ. P. 4(f)(1).  Because Canada is a signatory to the Hague Convention, service of process in Canada should be in accordance with the methods described in the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.  *See Indep. Film Dev. Corp. v. Junior Capital Inc.*, No. 13-cv-259-BRO, 2015 WL 12778352, at *3 (C.D. Cal. July 9, 2015); *see also Girafa.com, Inc. v. Smartdevil Inc.*, 728 F. Supp. 2d 537, 543 (D. Del. 2010).  For foreign service, if the plaintiff does not exercise diligence in trying to effectuate service, the case should be dismissed.  *See In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, No. 02-cv-6030, 2006 WL 1084093, at *3 (D.N.J. Apr. 24, 2006).  Shopify has not been served in accordance with the Hague Convention nor has IMI—having received notice as early as March 27, 2020 that its service was ineffective—shown any diligence in serving

Shopify.  Thus, this Court should dismiss this case for insufficient service of process under Rule 12(b)(5).

**C.      Under Rule 12(b)(6), this Court should dismiss the complaint because IMI fails to state a claim upon which relief can be granted.**

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege non-conclusory facts that make liability "plausible," meaning that they "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Chalumeau Power Sys. LLC v. Alcatel-Lucent*, No. 11-cv-1175-RGA, 2012 WL 6968938, at *2 (D. Del. Sept. 24, 2014) ("[T]here must be facts alleged that 'are sufficient to show that the plaintiff has a plausible claim for relief.'").  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (internal quotations marks omitted).  Additionally, "under any pleading standard, a complaint must put a defendant 'on notice as to what he must defend.'"  *Artrip v. Ball Corp.*, 735 F. App'x 708, 715 (Fed. Cir. 2018) (affirming district court's dismissal of complaint that used broad functional language copied from patent).

**1.      IMI fails to properly allege a claim for infringement because the complaint lacks factual support for IMI's divided infringement theory.**

Direct infringement requires that all elements of the claim be performed by or attributable to a single actor.  *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc).  "Divided infringement occurs when more than one actor is involved in practicing the steps and the acts of one are attributable to the other such that a single entity is responsible for the infringement."  *Int'l Bus. Machs. Corp. v. Booking Holdings Inc.*, 775 F. App'x 674, 678 (Fed.

Cir. 2019) (internal quotation marks omitted).  In *Akamai*, the en banc Federal Circuit held that one entity is responsible for the acts of others "(1) where that entity directs or controls others' performance, and (2) where the actors form a joint enterprise."  *Akamai*, 797 F.3d at 1022.

The Federal Circuit has articulated two general principles to determine if a single entity directs or controls the acts of another.  First, an entity directs or controls the acts of another "if it acts through an agent (applying traditional agency principles) or contracts with another to perform one or more steps of a claimed method."  *Id.* at 1023.  Second, an entity directs or controls another if it "conditions participation in an activity or receipt of a benefit upon performance of a step" and "establishes the manner or timing of that performance."  *Id.*  The Federal Circuit has also articulated the elements required to form a joint enterprise.  "A joint enterprise requires proof of four elements:  (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control."  *Id.*

By asserting infringement "based on the actions of other persons/entities," IMI alleges a divided infringement theory of liability.  Compl. ¶ 12.  IMI, however, fails to allege facts to support a plausible claim of divided infringement.  Based on its complaint, IMI appears to allege that the end user's actions (*i.e.,* a person reading a Twitter feed) are attributable to Shopify.  *See id.* ¶ 12(d).  However, IMI has not alleged that the user, who, again, is a random individual browsing Shopify's public Twitter feed, is an agent of Shopify's or that there is a contractual relationship between Shopify and the user.  Except to assert conclusory allegations using the legal standards from *Akamai* and vague references to "promotional offerings," IMI has not alleged how Shopify "conditions participation in an activity or receipt of a benefit" and "establishes the manner or

14

timing of that performance." *See id.* ¶¶ 12(d), 13.  These vague assertions do not put Shopify on notice as to what IMI's infringement theory is and what Shopify must defend.  *See Artrip*, 735 F. App'x at 715.  Finally, IMI has not alleged any facts that Shopify has formed a joint enterprise with the individuals browsing a public Twitter feed.  Therefore, IMI fails to properly allege any theory of divided infringement.

Additionally, IMI fails to identify what "other online medium" in addition to Shopify's Twitter feed infringes.  *See* Compl. ¶ 12(a).  As far as Shopify can discern, besides Shopify's Twitter feed, the only other online medium mentioned in the complaint is Shopify's main website at www.shopify.com.  However, Shopify's website features no "spr.ly" links, which IMI repeatedly relies upon for its infringement theory.  *See id.* ¶ 12(c), (d).  IMI has also alleged no facts demonstrating how Shopify's website allegedly infringes the different claim elements.  Furthermore, IMI's allegations related to "advertisements" again allege no facts as to how these advertisements allegedly infringe the asserted claims.  The complaint therefore fails to plausibly allege infringement.   Based on the lack of sufficient factual allegations, IMI's claims for infringement should be dismissed under Rule 12(b)(6).

> **2.      IMI fails to properly allege an act of infringement that occurred within the relevant time period, and thus, the claims must be dismissed.**

Separately, IMI's claims should be dismissed for failing to allege an act of infringement within the relevant time period.  Under 35 U.S.C. § 286, "no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action."  35 U.S.C. § 286.  Thus, the earliest date of recovery is March 25, 2014, which is six years before the filing date of the complaint.  Additionally, because the '835 patent expired on August 30, 2016, IMI cannot recover damages past that date.  Thus, the relevant timeframe for this case is March 25, 2014 through August 30, 2016.  However, IMI fails to allege

any facts in the complaint that show an act of infringement that occurred during the relevant time period.  Indeed, Exhibits 2-3, 2-4, and 2-5, which compare IMI's complaint against three different defendants and its complaint against Shopify, shows how IMI simply regurgitates its standard allegations without regard to the defendant and the expiration of the '835 patent.  Thus, IMI's complaint fails to properly plead an act of infringement within the relevant time frame and should be dismissed.

### 3.    IMI fails to allege a claim for infringement because the claims of the '835 patent are directed to patent-ineligible subject matter under 35 U.S.C. § 101.

The claims of the '835 patent are directed to patent-ineligible subject matter and thus the patent cannot form the basis of an infringement action.  "[P]atent eligibility can be determined at the Rule 12(b)(6) stage . . . when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).  Under 35 U.S.C. § 101, anyone who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may obtain a patent.  35 U.S.C. § 101.  The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

Under the two-step framework from *Alice*, the Court must first determine "whether the claims at issue are directed to a patent-ineligible concept."  *Id.* at 218.  If so, then the Court "examine[s] the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 221 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72–73, 78).  Under this second step, the Court "look[s] with more specificity at what the claim elements add, in order

to determine whether they identify an inventive concept in the application of the ineligible subject matter to which the claim is directed." *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1338 (Fed. Cir. 2017) (citations and quotations omitted).

The '835 patent contains two independent claims—claims 1 and 11. Claim 1 is written in system form, whereas claim 11 is written as a method claim but otherwise tracks the language of claim 1. The claims that depend from claims 1 and 11 are also similarly written and confirm that the purported invention utilizes conventional technology to implement the abstract idea, *e.g.*, a "personal computer" (claims 2 and 12), a "television Internet device" (claims 3 and 13), a television "remote control" (claims 4 and 14), the "World Wide Web" (claims 5 and 15), "printed matter" (claims 6 and 16), an "Internet location" (claims 7 and 17), an "on-screen HTML form" (claims 8 and 18), a "four digit number" (claims 9 and 19), and a "review" of an Internet location (claims 10 and 20). *See* '835 patent at 8:40–67, 10:1–26.

For the purposes of this Motion, Shopify addresses claim 11, which IMI asserts in the complaint and appears to allege as representative. Under *Alice* step one, the claims are directed to the abstract idea of publishing a collection of information to access data. *See* '835 patent at 9:1–28. Courts have consistently held that collecting, analyzing, and displaying information is an abstract idea. *See Intellectual Ventures I*, 850 F.3d at 1340 (determining that displaying web content was an abstract idea); *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1353–54 (Fed. Cir. 2016) (determining that "collecting information, analyzing it, and displaying certain results" is an abstract idea). In fact, using this Court's prior claim construction, IMI itself alleges that the "published compilation of preselected Internet locations" means "a publicly accessible *collection of information* which corresponds to preselected web sites . . . ." *See Internet Media Corp. v. Dell. Inc.*, No. 05-cv-633, D.I. 175 at 4 (D. Del. Jan. 14, 2009) (emphasis added); *see also* Compl.

¶ 12(a).  Thus, the decision IMI cites in its complaint conclusively establishes that the claim is merely directed to publishing a "collection of information" and accessing web content using that collection of information.  *See id.* ¶ 12(a), (d), (g).  This is an abstract idea.

In *DDR Holdings*, the Federal Circuit held that if a claimed solution "is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks," then it may not be directed to an abstract idea.  *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).  However, IMI has not alleged that the claimed method is directed to an improvement in computer functionality.  Nor could it.  In fact, one of the '835 patent's preferred embodiments is not even rooted in computer technology, but is a "printed publication" or "book."  *See* '835 patent at 5:51, 56.  Printed publications or books are certainly not an improvement in computer functionality.

Under *Alice* step two, IMI has not alleged any facts that the claims recite something more than the abstract idea.  The courts have consistently held that implementing an abstract idea on generic computer components is not sufficient to transform the abstract idea into patent-eligible subject matter.  *See, e.g.*, *Alice*, 573 U.S. at 225–26 (holding that "implement[ing] the abstract idea . . . on a generic computer" was not sufficient "to transform an abstract idea into a patent-eligible invention"); *Intellectual Ventures I*, 850 F.3d at 1341–42 (Fed. Cir. 2017) (holding that "using generic computer components and conventional computer data processing activities" was not sufficient to find an "inventive concept"); *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324–25 (Fed. Cir. 2016) (holding that generic computer components such as an "interface," "network," and "database" fail to satisfy the "inventive concept requirement" (internal quotation marks omitted)).  As the dependent claims reveal, the '835 patent claims only generic computer components.  *See* '835 patent at 8:40–67, 10:1–26.  Additionally, the '835 patent

specification discloses only generic technology as well—for example, "personal computer," "Web browser," "modem," "the Internet," "video monitor," "keyboard," and "mouse." *See id.* at 5:24–34.

Furthermore, IMI has not alleged, nor could it allege, anything inventive about the ordered combination of steps. *See BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016). The claim describes first publishing a collection of information, and then giving a user access to a webpage. Entering a jump code or URL before accessing a webpage is the "only logical order" that one could perform these steps in order to access a webpage. *See TrackTime, LLC v. Amazon.com, Inc.*, No. 18-cv-1518-MN, 2019 WL 2524779, at *5 (D. Del. June 19, 2019) (determining that if the "ordered combination is the only logical order," then there is no inventive concept). Thus, there is nothing inventive about the ordered combination of steps nor has IMI alleged so. Because there are no factual allegations regarding the inventive concepts of the claims of the '835 patent that would transform the abstract idea into patent-eligible subject matter, the claims are directed to patent-ineligible subject matter and cannot serve as the basis for a patent infringement claim. Thus, the Court should dismiss IMI's complaint under Rule 12(b)(6) on this basis as well.

## VI.   CONCLUSION

IMI's lack of effort could not be more apparent. IMI has brazenly filed the same complaint against Shopify that it has filed in fifty-two other cases, all of which accuse a defendant's Twitter feed of patent infringement. In its last-gasp effort to extract value where none exists, (1) IMI failed to account for the absence of personal jurisdiction; (2) IMI failed to properly serve the defendant; (3) IMI failed to allege sufficient factual allegations to support its claims for infringement; and (4) IMI failed to assert a patent with claims directed to patentable subject matter. Accordingly, Shopify respectfully requests that this Court dismiss IMI's case with prejudice.

Dated:  May 29, 2020

Respectfully submitted,

MCCARTER & ENGLISH, LLP

OF COUNSEL:

Mark Reiter (admitted *pro hac vice*)
Y. Audrey Yang (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100
mreiter@gibsondunn.com
ayang@gibsondunn.com

Brian M. Buroker (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
bburoker@gibsondunn.com

*/s/ DRAFT*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Center
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Defendant Shopify Inc.*

Reiter Decl. Ex. 1 p. 025

# DECLARATION OF LISA HARTMAN

## IN SUPPORT OF MOTION TO DISMISS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERNET MEDIA INTERACTIVE CORP., <br><br> Plaintiff, <br><br> v. <br><br> SHOPIFY INC., <br><br> Defendant. | Case No. 20-416-MN |

### DECLARATION OF LISA HARTMAN IN SUPPORT OF MOTION TO DISMISS

I, Lisa Hartman, hereby declare:

    1.    I am employed by Shopify Inc. ("Shopify"), the Defendant in the above-captioned action.  I am an Associate Privacy Counsel and have served in that capacity for 2 years.  My position involves ensuring Shopify's compliance with data protection laws.  I submit this declaration in support of Shopify's Motion to Dismiss.  I make this declaration on my own knowledge, and I would testify to the matters stated herein if called upon to do so.

    2.    Shopify is a corporation organized under the laws of Canada, with its principal place of business in Ottawa, Ontario, Canada.  Shopify provides e-commerce platforms that power the websites of merchants, primarily small- and medium-sized businesses that use the software to operate their online storefronts.

    3.    Shopify does not own any properties in Delaware, including office space, real property, residence, or place of business.  All of its employees, including its corporate officers, reside and work in Canada.  Thus, any media activities are managed by employees in Canada.

Reiter Decl. Ex. 1 p. 027

4.      Shopify has a website (www.shopify.com), which provides information and advertisements regarding its various e-commerce products and services.  Potential customers may sign up for a trial account, that does not require a credit card.  Should a customer later upgrade to a paid plan, it occurs outside of the website.  During the time frame relevant for the claims of the law suit, the website was managed by employees in Canada.  Shopify does not direct its website or advertisements to residents of Delaware.  Shopify has not implemented any access restrictions on its website, and it is generally available to the public.

5.      Shopify has a Twitter account and has a Twitter feed (www.twitter.com/shopify). Twitter allows Shopify to post information and not to sell any products.  Visitors to the Twitter feed cannot purchase anything from Shopify or conduct business with Shopify.  During the time frame relevant for the claims of the law suit, the Twitter account was managed by employees in Canada.  Shopify does not direct its Twitter feed to residents of Delaware.

6.      Shopify is not registered to do business in Delaware and does not have a bank account in Delaware.


Executed on May 29, 2020, in Ottawa, Ontario.


_____

Lisa Hartman

2

# DECLARATION OF MARK REITER

### IN SUPPORT OF MOTION TO DISMISS

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| INTERNET MEDIA INTERACTIVE CORP., <br><br> Plaintiff, <br><br> v. <br><br> SHOPIFY INC., <br><br> Defendant. | Case No. 20-416-MN |

**DECLARATION OF MARK REITER IN SUPPORT OF MOTION TO DISMISS**

I, Mark Reiter, hereby declare:

1.       I am a partner with the law firm of Gibson, Dunn & Crutcher LLP, counsel for defendant Shopify Inc. ("Shopify") in the above-captioned matter.  I am a member in good standing of the State Bar of Texas.  I submit this declaration in support of Shopify's Motion to Dismiss.  I make this declaration on my own knowledge, and I would testify to the matters stated herein under oath if called upon to do so.

2.       On March 27, 2020, CT Corporation sent a letter to Internet Media Interactive Corp. ("IMI"), the plaintiff in the above-captioned matter, notifying IMI that CT Corporation is not the registered agent for Shopify.  A copy of the letter is attached hereto as Exhibit 1.

3.       On April 9, 2020, I notified counsel for IMI that Shopify had not yet been served. A copy of the email is attached hereto as Exhibit 2.

4.       As of the date of this declaration, IMI has not requested that Shopify waive service pursuant to Federal Rule of Civil Procedure 4(d).

1

5.      Comparisons, using the software Workshare Compare 9.5, of the complaint against Shopify versus the complaints against (1) United Airlines, Inc. (Case No. 1:17-cv-02934, D.I. 1 (N.D. Ill. Apr. 19, 2017)); (2) The Coca-Cola Company (Case No. 1:18-cv-00975, D.I. 1 (D. Del. June 29, 2018)); and (3) Unilever PLC (Case No. 1:20-cv-00099, D.I. 1 (D. Del. Jan. 22, 2020)), are attached hereto as Exhibits 3–5.

Executed on May XX, 2020, in Dallas, Texas.

_Draft_
Mark Reiter

2

# EXHIBIT 1

## TO DECLARATION OF MARK REITER IN SUPPORT OF MOTION TO DISMISS



March 27, 2020

George Pazuniak
O'Kelly & Ernest, LLC
824 N Market St, Ste 1001A,
Wilmington, DE  19801

Re:  Internet media Interactive Corp., Pltf. vs. Shopify, Inc. Dft.

Case No.  120CV00416

Dear Sir/Madam:

After checking our records and the records of the State of DE, it has been determined that The Corporation
Trust Company is not the registered agent for an entity by the name of Shopify Inc..

CT was unable to forward.

Very truly yours,

The Corporation Trust Company

Log# 537452137

Sent By Regular Mail

cc:  --
 **(Returned To)**

George Pazuniak
O'Kelly & Ernest, LLC
824 N Market St, Ste 1001A,
Wilmington, DE  19801

# EXHIBIT 2

TO DECLARATION OF MARK REITER
IN SUPPORT OF MOTION TO DISMISS

**Reiter, Mark**

| | |
|---|---|
| **Subject:** | Re: Internet Media Interactive v. Shopify |
| **Date:** | Thursday, April 9, 2020 at 9:57:03 AM Central Daylight Time |
| **From:** | Reiter, Mark <MReiter@gibsondunn.com> |
| **To:** | Katy Dickman <dickman@haller-iplaw.com>, Timothy Haller <haller@haller-iplaw.com>, gp@del-iplaw.com <gp@del-iplaw.com> |
| **CC:** | Buroker, Brian M. <BBuroker@gibsondunn.com> |
| **Attachments:** | image001.png, image002.jpg |

Hi Katy,

Thank you for the email.  While it does not appear that Shopify has actually been served (we understand that CTC did not accept the summons), we are fine with the stipulation to extend time and appreciate your help getting it filed. If you could forward a filed-copy, that would also be appreciated.

We are reviewing the other materials included with your email and will respond shortly.

Best regards,

Mark

**Mark Reiter**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100, Dallas, TX 75201
Tel +1 214.698.3360 • Fax +1 214.571.2907
MReiter@gibsondunn.com • www.gibsondunn.com

# EXHIBIT 3

TO DECLARATION OF MARK REITER
IN SUPPORT OF MOTION TO DISMISS

**IN THE UNITED STATES DISTRICT COURT
FOR THE ~~NORTHERN~~ DISTRICT OF
~~ILLINOIS EASTERN
DIVISION~~DELAWARE**

| | |
|---|---|
| INTERNET MEDIA INTERACTIVE CORP., <br><br>              Plaintiff, <br><br>     v. <br><br> ~~UNITED AIRLINES,~~SHOPIFY INC., <br><br>              Defendant. | Case No.: <br><br> JURY TRIAL DEMANDED |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Internet Media Interactive Corp. ("Internet Media" or "Plaintiff") complains of Defendant ~~United Airlines,~~Shopify Inc. ("~~UAL~~Shopify" or "Defendant") as follows, all upon Plaintiff's best information and belief:

**NATURE OF LAWSUIT**

1.      This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

**THE PARTIES**

2.      Plaintiff Internet Media Interactive Corp. is a Delaware corporation with its principal place of business at ~~113 Barksdale Professional Center, Newark~~3511 Silverside Road, Suite 105, Wilmington, Delaware ~~19711.~~19810.

3.      Internet Media is the named assignee of, owns all right, title and interest in, and has standing to sue for infringement of United States Patent No. 6,049,835, entitled "System For Providing Easy Access To The World Wide Web Utilizing A Published List Of Preselected Internet Locations Together With Their Unique Multi-Digit Jump Codes," which issued on April 11, 2000 ("the '835 Patent") (a true and correct copy is attached as Exhibit A).

4.      Internet Media has the exclusive right to enforce and collect all past damages for infringement of the '835 Patent. Internet Media has standing to sue for infringement of the '835 Patent.

5.      ~~Upon information and belief, Defendant UAL is a Delaware corporation registered with the Illinois Secretary of State~~Shopify Inc. is a Canadian company with an agent for service in the United States at The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19808 and maintaining its principal place of business at ~~233 South Wacker Drive, Chicago, Illinois 60606.~~150 Elgin Street, 8th Floor, Ottawa, Ontario K2P 1L4 Canada.

6.      ~~Upon information and belief,~~ Defendant Shopify owns, provides and operates the website www.~~united~~shopify.com and related URLs. Defendant also distributes advertisements through various media that instruct recipients to enter a code to redirect to a new location. Specifically, Defendant ~~UAL~~ operates the account "@~~united~~Shopify" on Twitter, found at https://twitter.com/~~united~~shopify.

## JURISDICTION AND VENUE

7.      Internet Media's claim for patent infringement against Defendant arises under the patent laws of the United States including 35 U.S.C. §§ 271 and 281. Consequently, this Court has original and exclusive subject matter jurisdiction over this ~~suit~~Complaint pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.      Defendant ~~is subject to the specific personal jurisdiction of the Court because it is registered to do business and maintains its headquarters in Illinois~~owns, operates and conducts business in the state of Delaware and directs advertisements at residents of Delaware – which are covered by at least Claim 11 of the '835 Patent – and throughout the United States including Delaware and this judicial district.

9.      Shopify is currently doing business in this judicial district, has purposefully availed

itself of the privilege of conducting business with residents of this judicial district, has purposefully reached out to residents of this judicial district, and has established sufficient minimum contacts with the State of Delaware such that it should reasonably and fairly anticipate being haled into court in Delaware.

10.    Shopify has established sufficient minimum contacts with the State of Delaware such that it should reasonably and fairly anticipate being haled into court in Delaware.

11.    9.Venue in this judicial district is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), (d) and/or§ 1400(b).

### INFRINGEMENT OF UNITED STATES PATENT NO. 6,049,835

12.    10.Defendant has directly infringed the '835 Patent at least through its unauthorized use of the method of Claim 11 for providing automatic access to preselected locations on the Internet. Defendant alone, or based on the actions of other persons/entities attributable to Defendant, satisfied each of the limitations of Claim 11 as follows:

a.    Defendant has published a compilation of information with respect to preselected Internet locations (*e.g.*, advertisements on Twitter or other online medium). On January 4, 2009, the Delaware District Court in proceedings related to the '835 Patent construed the similar phrase "a published compilation of preselected Internet locations" to mean "a publicly accessible collection of information which corresponds to preselected Web sites (or to any other type of preselected data found on the Internet) which have unique URL addresses, the URL addresses being associated with diverse individuals or entities." Defendant has published a publicly accessible (*e.g.*, via Twitter or other online medium) collection of information which corresponded to preselected Web sites which have unique URL addresses (*e.g.*, information about a desired Web site destination of interest to a user), the URL addresses having been associated with entities other than Defendant.

b.    Said published compilation – published by Defendant – included a unique

predetermined multi-digit jump code assigned to each of said preselected Internet locations for which information is published therein (e.g., shortened codes recognized by ~~bit~~spr.ly). On January 4, 2009, the Delaware District Court also construed the phrase "a unique predetermined multi-digit jump code" to mean "a unique predetermined code consisting of more than one number." Defendant's published compilation included unique predetermined multi-digit jump codes consisting of more than one number (e.g., ~~2nWMVJ8~~6016BWrdr).

       c.     Defendant has provided – through its publication of compilations of various information on Twitter – a predetermined Internet location having an address published in said published compilation (*e.g.*, ~~bit~~spr.ly). On January 4, 2009, the Delaware District Court also construed the similar phrase "a predetermined published Internet location" to mean "a predetermined Web site (or any other type of data found on the Internet); (a) which has a unique URL address included in the published compilation; and (b) which serves to provide access to other preselected Internet locations." The predetermined Web site published by Defendant (a) had a unique URL address (*e.g.*, ~~bit~~spr.ly) included in the published compilation; and (b) which served to provide access to other preselected Internet locations. Said predetermined Internet location – managed by a link shortening service provider (*e.g.*, ~~Bitly~~Sprinklr) – was characterized by means for capturing a desired multi-digit jump code assigned to said preselected Internet location such that a multi-digit jump code could be entered by a user after the predetermined Internet location was accessed.

       d.     The user accessed said predetermined Internet location and entered said desired multi-digit jump code into said predetermined Internet location. Specifically, by clicking upon a URL embedded in the published compilation, the user accessed the predetermined Internet location (*e.g.*, ~~bit~~spr.ly) and, thereafter, entered the desired multi-

digit jump code at said predetermined Internet location (*e.g.*, ~~bit~~spr.ly). As presently advised, Defendant is vicariously liable for the user's performance of this step based on (a) Defendant conditioning participation in an activity (*e.g.*, participating in promotional offerings) or receipt of a benefit (*e.g.*, receiving promotional offerings or information of interest) upon the performance of this step – which step is required for the user to reach the new destination of interest; and (b) Defendant establishing the manner or timing of that performance – which, by the nature of the publication and the desired outcome from using the jump code to reach a new destination, necessarily requires performance of this step.

      e.     The link shortening service provider (*e.g.*, ~~Bitly~~Sprinklr) received said multi- digit jump code entered into said predetermined Internet location after said multi-digit jump code had been captured at said predetermined Internet location. As presently advised, Defendant is vicariously liable for a third-party link shortening service provider's (*e.g.*, ~~Bitly~~Sprinklr) performance of this step based on the existence of an agreement (see, https://~~bitly.com/pages/terms-of-service) between Bitly~~sprinklrsite.wpengine.com/wp-content/uploads/2016/03/Sprinklr-MSA-Online-USA-Version-1.3-20180413.pdf) between Sprinklr and Defendant.

      f.     The link shortening service provider (*e.g.*, ~~Bitly~~Sprinklr) converted the received multi-digit jump code to a URL address corresponding to the desired preselected Internet location. As presently advised, Defendant is vicariously liable for a third-party link shortening service provider's (*e.g.*, ~~Bitly~~Sprinklr) performance of this step based on the existence of an agreement (see, https://~~bitly.com/pages/terms-of-service) between Bitly~~sprinklrsite.wpengine.com/wp- content/uploads/2016/03/Sprinklr-MSA-Online-USA-Version-1.3-20180413.pdf) between Sprinklr and Defendant.

      g.     The link shortening service provider (*e.g.*, ~~Bitly~~Sprinklr) automatically

accessed said desired preselected Internet location using said URL address corresponding to said desired preselected Internet location corresponding to said received multi-digit jump code.

13. 11.Defendant has directly infringed at least Claim 11 of the '835 Patent through the performance of all steps of the claimed method under the doctrine set forth in *Akamai Technologies, Inc. v. Limelight Networks, Inc.,* 797 F.3d 1020 (2015Fed. Cir. 2015). See also *Travel Sentry, Inc. v. David A. Tropp,* 2016-2386 (Fed. Cir. Dec. 19, 2017). Defendant had the right and ability to stop or limit the infringement, did not do so, and has profited from such infringement.

14. 12.The acts of infringement of the '835 Patent by Defendant have injured Internet Media, and Internet Media is entitled to recover damages adequate to compensate it for such infringement from Defendant, but, in no event less than a reasonable royalty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Internet Media Interactive Corp. respectfully requests that this Court enter judgment against the Defendant United Airlines,Shopify Inc., and against its respective subsidiaries, successors, parents, affiliates, officers, directors, agents, servants, employees and all persons in active concert or participation with it, granting the following relief:

A.      The entry of judgment in favor of Internet Media and against Defendant;

B.      An award of damages against Defendant adequate to compensate Internet Media for the infringement that has occurred, but in no event less than a reasonable royalty as permitted under 35 U.S.C. § 284, together with prejudgment interest from the date infringement began; and

C.      Such other relief to which Internet Media is entitled to under law and any other and further relief that this Court or a jury may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues presented in this Complaint.

Reiter Decl. Ex. 1 p. 043

Dated: ~~April 19, 2017~~
~~Respectfully~~
~~submitted,~~March 25, 2020

*Of Counsel:*

Respectfully submitted,

*/s/ George Pazuniak*
George Pazuniak (DE Bar 478)
O'KELLY & ERNST, LLC
824 N Market St, Ste 1001A
Wilmington, DE 19801 Phone:
(302) 478-4230 Fax: (302)
295-2873 gp@del-iplaw.com

~~T~~
~~A~~ ~~Attorney~~**Attorneys** *for Plaintiff, Internet Media*
~~m~~ *Interactive Corp.*
~~o~~
~~t~~
~~h~~
~~y~~
~~J~~
~~.~~
~~H~~
~~a~~
~~l~~
~~l~~
~~e~~
~~r~~

Timothy J. Haller
HALLER LAW
PLLC~~The Monadnock~~
~~Building 53 West~~
~~Jackson Boulevard,~~
~~Suite 1623~~ 230 E
Delaware Pl, Ste 5E
Chicago, IL
~~60604~~60611 Phone:
(630) 336-4283
haller@haller-
iplaw.com

Document comparison by Workshare 9.5 on Tuesday, May 26, 2020 2:11:36 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\22776\Desktop\Matters\Shopify\Prior Cases\NDIL-1-17-cv-02934-1 - Complaint_United.pdf |
| Description | NDIL-1-17-cv-02934-1 - Complaint_United |
| Document 2 ID | file://C:\Users\22776\Desktop\Matters\Shopify\Prior Cases\DDE-1-20-cv-00416-1 - Complaint_Shopify.pdf |
| Description | DDE-1-20-cv-00416-1 - Complaint_Shopify |
| Rendering set | GDCv9Rendering |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 55 |
| Deletions | 45 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 100 |

# EXHIBIT 4

## TO DECLARATION OF MARK REITER IN SUPPORT OF MOTION TO DISMISS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ~~INTERNET MEDIA INTERACTIVE CORP.,~~ | ~~Case No.:~~ |
| ~~Plaintiff,~~ | ~~JURY TRIAL DEMANDED~~ |
| ~~v.~~ | |
| ~~THE COCA-COLA COMPANY,~~ | |
| ~~Defendant.~~ | |

| | |
|---|---|
| **INTERNET MEDIA INTERACTIVE CORP.,** | **Case No.:** |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **SHOPIFY INC.,** | |
| **Defendant.** | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Internet Media Interactive Corp. ("Internet Media" or "Plaintiff") complains of Defendant ~~The Coca-Cola Company ("Coca-Cola~~Shopify Inc. ("Shopify" or "Defendant") as follows, all upon Plaintiff's best information and belief:

**NATURE OF LAWSUIT**

1.     This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

**THE PARTIES**

2.     Plaintiff Internet Media Interactive Corp. is a Delaware corporation with its principal place of business at 3511 Silverside Road, Suite 105, Wilmington, Delaware 19810.

3.     Internet Media is the named assignee, owns all right, title and interest in, and has standing to sue for infringement of United States Patent No. 6,049,835, entitled "System For Providing Easy Access To The World Wide Web Utilizing A Publisher Ristof Preselected

Internet Locations Together With Their Unique Multi-Digit Jump Codes," which issued on April

11, 2000 ("the '835 Patent") (a true and correct copy is attached as Exhibit A).

4.    Internet Media has the exclusive right to enforce and collect all past damages for infringement of the '835 Patent. Internet Media has standing to sue for infringement of the '835 Patent.

5.    ~~The Coca-Cola Company~~Shopify Inc. is a ~~Delaware corporation~~Canadian company with ~~a registered~~an agent ~~of The Corporation Trust Company located at~~for service in the United States at The Corporation Trust ~~Center~~Company, 1209 Orange Street, Wilmington, Delaware ~~19801~~19808 and maintaining its principal place of business at ~~One Coca-Cola Plaza, Atlanta, Georgia, 30313.~~150 Elgin Street, 8th Floor, Ottawa, Ontario K2P 1L4 Canada.

6.    Defendant ~~Coca-Cola~~Shopify owns, provides and operates the website www.~~coca-colacompany~~shopify.com and related URLs. Defendant also distributes advertisements through various media that instruct recipients to enter a code to redirect to a new location. Specifically, Defendant operates the account "@~~CocaColaCo~~Shopify" on Twitter, found at https://twitter.com/~~CocaColaCo~~shopify.

## JURISDICTION AND VENUE

7.    Internet Media's claim for patent infringement against Defendant arises under the patent laws of the United States including 35 U.S.C. §§ 271 and 281. Consequently, this Court has original and exclusive subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.    Defendant owns, operates and conducts business in the state of Delaware and directs advertisements at residents of Delaware – which are covered by at least Claim 11 of the '835 Patent – and throughout the United States including Delaware and this judicial district.

9.    ~~The Coca-Cola Company is a registered Delaware corporation,~~Shopify is currently doing business in this judicial district, has purposefully availed itself of the privilege of conducting business with residents of this judicial district, has purposefully reached out to

residents of this judicial district, and has established sufficient minimum contacts with the State of Delaware such that it should reasonably and fairly anticipate being haled into court in Delaware.

~~10.The Coca-Cola Company has registered itself with the Delaware Secretary of State to do business in Delaware and has a designated agent incident to such registration.~~

10.    ~~11.The Coca-Cola Company~~Shopify has established sufficient minimum contacts with the State of Delaware such that it should reasonably and fairly anticipate being haled into court in Delaware.

11.    ~~12.~~Venue in this judicial district is proper under 28 U.S.C. § 1400(b).

**INFRINGEMENT OF UNITED STATES PATENT NO. 6,049,835**

12.    ~~13.~~Defendant has directly infringed the '835 Patent at least through its unauthorized use of the method of Claim 11 for providing automatic access to preselected locations on the Internet. Defendant alone, or based on the actions of other persons/entities attributable to Defendant, satisfied each of the limitations of Claim 11 as follows:

a.    Defendant has published a compilation of information with respect to preselected Internet locations (*e.g.*, advertisements on Twitter or other online medium). On January 4, 2009, the Delaware District Court in proceedings related to the '835 Patent construed the similar phrase "a published compilation of preselected Internet locations" to mean "a publicly accessible collection of information which corresponds to preselected Web sites (or to any other type of preselected data found on the Internet) which have unique URL addresses, the URL addresses being associated with diverse individuals or entities." Defendant has published a publicly accessible (*e.g.*, via Twitter or other online medium) collection of information which corresponded to preselected Web sites which have unique URL addresses (*e.g.*, information about a desired Web site destination of

interest to a user), the URL addresses having been associated with entities other than Defendant.

b.      Said published compilation – published by Defendant – included a unique predetermined multi-digit jump code assigned to each of said preselected Internet locations for which information is published therein (e.g., shortened codes recognized by ~~bit~~spr.ly). On January 4, 2009, the Delaware District Court also construed the phrase "a unique predetermined multi-digit jump code" to mean "a unique predetermined code consisting of

more than one number." Defendant's published compilation included unique predetermined multi-digit jump codes consisting of more than one number (e.g., ~~1nYJSj0~~6016BWrdr).

c.      Defendant has provided – through its publication of compilations of various information on Twitter – a predetermined Internet location having an address published in said published compilation (e.g., ~~bit~~spr.ly). On January 4, 2009, the Delaware District Court also construed the similar phrase "a predetermined published Internet location" to mean "a predetermined Web site (or any other type of data found on the Internet); (a) which has a unique URL address included in the published compilation; and (b) which serves to provide access to other preselected Internet locations." The predetermined Web site published by Defendant (a) had a unique URL address (e.g., ~~bit~~spr.ly) included in the published compilation; and (b) which served to provide access to other preselected Internet locations. Said predetermined Internet location – managed by a link shortening service provider (e.g., ~~Bitly~~Sprinklr) – was characterized by means for capturing a desired multi-digit jump code assigned to said preselected Internet location such that a multi-digit jump code could be entered by a user after the predetermined

Internet location was accessed.

d.      The user accessed said predetermined Internet location and entered said desired multi-digit jump code into said predetermined Internet location. Specifically, by clicking upon a URL embedded in the published compilation, the user accessed the predetermined Internet location (*e.g.*, ~~bit~~spr.ly) and, thereafter, entered the desired multi-digit jump code at said predetermined Internet location (*e.g.*, ~~bit~~spr.ly). As presently advised, Defendant is vicariously liable for the user's performance of this step based on (a) Defendant conditioning participation in an activity (*e.g.*, participating in promotional offerings) or receipt of a benefit (*e.g.*, receiving promotional offerings or information of interest) upon the performance of this step – which step is required for the user to reach the new destination of interest; and (b) Defendant establishing the manner or timing of that performance – which, by the nature of the publication and the desired outcome from using the jump code to reach a new destination, necessarily requires performance of this step.

e.      The link shortening service provider (*e.g.*, ~~Bitly~~Sprinklr) received said multi- digit jump code entered into said predetermined Internet location after said multi-digit jump code had been captured at said predetermined Internet location. As presently advised, Defendant is vicariously liable for a third-party link shortening service provider's (*e.g.*, ~~Bitly~~Sprinklr) performance of this step based on the existence of an agreement (see, https://~~bitly.com/pages/terms-of-service) between Bitly~~sprinklrsite.wpengine.com/wp-content/uploads/2016/03/Sprinklr-MSA-Online-USA-Version-1.3-20180413.pdf) between Sprinklr and Defendant.

f.      The link shortening service provider (*e.g.*, ~~Bitly~~Sprinklr) converted the received multi-digit jump code to a URL address corresponding to the desired preselected

Internet location. As presently advised, Defendant is vicariously liable for a third-party link shortening service provider's (*e.g.*, ~~Bitly~~Sprinklr) performance of this step based on the existence of an agreement (see, https://~~bitly.com/pages/terms-of-service) between Bitly~~sprinklrsite.wpengine.com/wp-content/uploads/2016/03/Sprinklr-MSA-Online-USA-Version-1.3-20180413.pdf) between Sprinklr and Defendant.

       g.     The link shortening service provider (*e.g.*, ~~Bitly~~Sprinklr) automatically accessed said desired preselected Internet location using said URL address corresponding to said desired preselected Internet location corresponding to said received multi-digit jump code.

13.     ~~14.~~Defendant has directly infringed at least Claim 11 of the '835 Patent through the performance of all steps of the claimed method under the doctrine set forth in *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015). See also *Travel Sentry, Inc. v. David A. Tropp*, 2016-2386 (Fed. Cir. Dec. 19, 2017). Defendant had the right and ability to stop or limit the infringement, did not do so, and has profited from such infringement.

14.     ~~15.~~The acts of infringement of the '835 Patent by Defendant have injured Internet Media, and Internet Media is entitled to recover damages adequate to compensate it for such infringement from Defendant, but, in no event less than a reasonable royalty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Internet Media Interactive Corp. respectfully requests that this Court enter judgment against Defendant ~~The Coca-Cola Company~~Shopify Inc. and against its respective subsidiaries, successors, parents, affiliates, officers, directors, agents, servants, employees and all persons in active concert or participation with it, granting the following relief:

      A.     The entry of judgment in favor of Internet Media and against Defendant;

B.      An award of damages against Defendant adequate to compensate Internet Media for the infringement that has occurred, but in no event less than a reasonable royalty as permitted under 35 U.S.C. § 284, together with prejudgment interest from the date infringement began; and

C.      Such other relief to which Internet Media is entitled to under law and any other and further relief that this Court or a jury may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues presented in this Complaint.

Dated: ~~June 29, 2018~~March 25, 2020

Respectfully submitted,

*/s/ George Pazuniak*

*Of Counsel:*

George Pazuniak (DE Bar 478)
O'KELLY~~,~~ & ERNST~~ & JOYCE,~~ LLC ~~901 North~~824 N Market ~~Street, Suite 1000~~St, Ste 1001A Wilmington, DE 19801 Phone: (302) 478-4230 Fax: (302) 295-2873 gp@del-iplaw.com

Timothy J. Haller
HALLER LAW PLLC
~~53 West Jackson Boulevard, Suite 1623~~230 E Delaware Pl, Ste 5E Chicago, IL ~~60604~~60611 Phone: (630) 336-4283
haller@haller-iplaw.com

***Attorneys for Plaintiff, Internet Media Interactive Corp.***

Document comparison by Workshare 9.5 on Tuesday, May 26, 2020 1:32:27 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\22776\Desktop\Matters\Shopify\Prior Cases\DDE-1-18-cv-00975-1 - Complaint_Coke.pdf |
| Description | DDE-1-18-cv-00975-1 - Complaint_Coke |
| Document 2 ID | file://C:\Users\22776\Desktop\Matters\Shopify\Prior Cases\DDE-1-20-cv-00416-1 - Complaint_Shopify.pdf |
| Description | DDE-1-20-cv-00416-1 - Complaint_Shopify |
| Rendering set | GDCv9Rendering |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 52 |
| Deletions | 49 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 101 |

# EXHIBIT 5

## TO DECLARATION OF MARK REITER IN SUPPORT OF MOTION TO DISMISS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ~~INTERNET MEDIA INTERACTIVE CORP.,~~ | |
| ~~Plaintiff,~~ | ~~Case No.:~~ |
| ~~v.~~ | ~~JURY TRIAL DEMANDED~~ |
| ~~UNILEVER PLC,~~ | |
| ~~Defendant.~~ | |

| | |
|---|---|
| **INTERNET MEDIA INTERACTIVE CORP.,** | |
| **Plaintiff,** | **Case No.:** |
| **v.** | **JURY TRIAL DEMANDED** |
| **SHOPIFY INC.,** | |
| **Defendant.** | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Internet Media Interactive Corp. ("Internet Media" or "Plaintiff") complains of Defendant ~~Unilever PLC~~Shopify Inc. ("~~Unilever~~Shopify" or "Defendant") as follows, all upon Plaintiff's best information and belief:

**NATURE OF LAWSUIT**

1.      This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

**THE PARTIES**

2.      Plaintiff Internet Media Interactive Corp. is a Delaware corporation with its principal place of business at 3511 Silverside Road, Suite 105, Wilmington, Delaware 19810.

3.      Internet Media is the named assignee, owns all right, title and interest in, and has standing to sue for infringement of United States Patent No. 6,049,835, entitled "System For Providing Easy Access To The World Wide Web Utilizing A Publisher List Of Preselected

Internet Locations Together With Their Unique Multi-Digit Jump Codes," which issued on April

11, 2000 ("the '835 Patent") (a true and correct copy is attached as Exhibit A).

4.      Internet Media has the exclusive right to enforce and collect all past damages for infringement of the '835 Patent. Internet Media has standing to sue for infringement of the '835 Patent.

5.      ~~Unilever PLC~~Shopify Inc. is a ~~United Kingdom public limited company with a registered office at Port Sunlight, Wirral, Merseyside, CH62 4ZD United Kingdom~~Canadian company with an agent for service in the United States at The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19808 and maintaining its principal place of business at ~~Unilever House, 100 Victoria Embankment, London, EC4Y 0DY United Kingdom~~150 Elgin Street, 8th Floor, Ottawa, Ontario K2P 1L4 Canada.

6.      Defendant ~~Unilever~~Shopify owns, provides and operates the website www.~~unilever~~shopify.com and related URLs. Defendant also distributes advertisements through various media that instruct recipients to enter a code to redirect to a new location. Specifically, Defendant operates the account "@~~Unilever~~Shopify" on Twitter, found at https://twitter.com/~~Unilever~~shopify.

## JURISDICTION AND VENUE

7.      Internet Media's claim for patent infringement against Defendant arises under the patent laws of the United States including 35 U.S.C. §§ 271 and 281. Consequently, this Court has original and exclusive subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.      Defendant owns, operates and conducts business in the state of Delaware and directs advertisements at residents of Delaware – which are covered by at least Claim 11 of the '835 Patent – and throughout the United States including Delaware and this judicial district.

9.      ~~Unilever PLC~~Shopify is currently doing business in this judicial district, has purposefully availed itself of the privilege of conducting business with residents of this judicial

district, has purposefully reached out to residents of this judicial district, and has established sufficient minimum contacts with the State of Delaware such that it should reasonably and fairly anticipate being haled into court in Delaware.

10.     ~~Unilever PLC~~Shopify has established sufficient minimum contacts with the State of Delaware such that it should reasonably and fairly anticipate being haled into court in Delaware.

11.     Venue in this judicial district is proper under 28 U.S.C. § 1400(b).

### INFRINGEMENT OF UNITED STATES PATENT NO. 6,049,835

12.     Defendant has directly infringed the '835 Patent at least through its unauthorized use of the method of Claim 11 for providing automatic access to preselected locations on the Internet. Defendant alone, or based on the actions of other persons/entities attributable to Defendant, satisfied each of the limitations of Claim 11 as follows:

a.     Defendant has published a compilation of information with respect to preselected Internet locations (*e.g.*, advertisements on Twitter or other online medium). On January 4, 2009, the Delaware District Court in proceedings related to the '835 Patent construed the similar phrase "a published compilation of preselected Internet locations" to mean "a publicly accessible collection of information which corresponds to preselected Web sites (or to any other type of preselected data found on the Internet) which have unique URL addresses, the URL addresses being associated with diverse individuals or entities." Defendant has published a publicly accessible (*e.g.*, via Twitter or other online medium) collection of information which corresponded to preselected Web sites which have unique URL addresses (*e.g.*, information about a desired Web site destination of interest to a user), the URL addresses having been associated with entities other than Defendant.

b.      Said published compilation – published by Defendant – included a unique predetermined multi-digit jump code assigned to each of said preselected Internet locations for which information is published therein (e.g., shortened codes recognized by ~~po~~spr.~~st~~ly). On January 4, 2009, the Delaware District Court also construed the phrase "a unique predetermined multi-digit jump code" to mean "a unique predetermined code consisting of

more than    one    number."    Defendant's    published    compilation    included unique predetermined multi-digit jump codes consisting of more than one number (e.g., ~~Zv04M8~~6016BWrdr).

c.      Defendant has provided – through its publication of compilations of various information on Twitter – a predetermined Internet location having an address published in said published compilation (e.g., ~~po~~spr.~~st~~ly). On January 4, 2009, the Delaware District Court also construed the similar phrase "a predetermined published Internet location" to mean "a predetermined Web site (or any other type of data found on the Internet); (a) which has a unique URL address included in the published compilation; and (b) which serves to provide access to other preselected Internet locations." The predetermined Web site published by Defendant (a) had a unique URL address (e.g., ~~po~~spr.~~st~~ly) included in the published compilation; and (b) which served to provide access to other preselected Internet locations. Said predetermined Internet location – managed by a link shortening service provider (e.g., ~~RhythmOne~~Sprinklr) – was characterized by means for capturing a desired multi-digit jump code assigned to said preselected Internet location such that a multi-digit jump code could be entered by a user after the predetermined Internet location was accessed.

d.      The user accessed said predetermined Internet location and entered said

desired multi-digit jump code into said predetermined Internet location. Specifically, by clicking upon a URL embedded in the published compilation, the user accessed the predetermined Internet location (*e.g.*, ~~po~~spr.~~st~~ly) and, thereafter, entered the desired multi-digit jump code at said predetermined Internet location (*e.g.*, ~~po~~spr.~~st~~ly). As presently advised, Defendant is vicariously liable for the user's performance of this step based on (a) Defendant conditioning participation in an activity (*e.g.*, participating in promotional

offerings) or receipt of a benefit (*e.g.*, receiving promotional offerings or information of interest) upon the performance of this step – which step is required for the user to reach the new destination of interest; and (b) Defendant establishing the manner or timing of that performance – which, by the nature of the publication and the desired outcome from using the jump code to reach a new destination, necessarily requires performance of this step.

e.      The link shortening service provider (*e.g.*, ~~RhythmOne~~Sprinklr) received said multi- digit jump code entered into said predetermined Internet location after said multi-digit jump code had been captured at said predetermined Internet location. As presently advised, Defendant is vicariously liable for a third-party link shortening service provider's (*e.g.*, ~~RhythmOne~~Sprinklr) performance of this step based on the existence of an agreement (see, https://~~www.rhythmone.com/terms-of-use) between~~ ~~RhythmOne~~sprinklrsite.wpengine.com/wp-content/uploads/2016/03/Sprinklr-MSA-Online- USA-Version-1.3-20180413.pdf) between Sprinklr and Defendant.

f.      The link shortening service provider (*e.g.*, ~~RhythmOne~~Sprinklr) converted the received multi-digit jump code to a URL address corresponding to the desired preselected Internet location. As presently advised, Defendant is vicariously liable for a

third-party link shortening service provider's (*e.g.*, ~~RhythmOne~~Sprinklr) performance of this step based on the existence of an agreement (see, https://~~www.rhythmone.com/terms-of-use) between RhythmOne~~sprinklrsite.wpengine.com/wp-content/uploads/2016/03/Sprinklr-MSA-Online-USA-Version-1.3-20180413.pdf) between Sprinklr and Defendant.

g.      The link shortening service provider (*e.g.*, ~~RhythmOne~~Sprinklr) automatically accessed said desired preselected Internet location using said URL address corresponding to said desired preselected Internet location corresponding to said received multi-digit jump code.

13.     Defendant has directly infringed at least Claim 11 of the '835 Patent through the performance of all steps of the claimed method under the doctrine set forth in *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015). See also *Travel Sentry, Inc. v. David A. Tropp*, 2016-2386 (Fed. Cir. Dec. 19, 2017). Defendant had the right and ability to stop or limit the infringement, did not do so, and has profited from such infringement.

14.     The acts of infringement of the '835 Patent by Defendant have injured Internet Media, and Internet Media is entitled to recover damages adequate to compensate it for such infringement from Defendant, but, in no event less than a reasonable royalty.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Internet Media Interactive Corp. respectfully requests that this Court enter judgment against Defendant ~~Unilever PLC~~Shopify Inc. and against its respective subsidiaries, successors, parents, affiliates, officers, directors, agents, servants, employees and all persons in active concert or participation with it, granting the following relief:

A.      The entry of judgment in favor of Internet Media and against Defendant;

B.      An award of damages against Defendant adequate to compensate Internet Media for the infringement that has occurred, but in no event less than a reasonable royalty as permitted under 35 U.S.C. § 284, together with prejudgment interest from the date infringement began; and

C.      Such other relief to which Internet Media is entitled to under law and any other and further relief that this Court or a jury may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues presented in this Complaint.

Dated: ~~January 22,~~March 25, 2020

Respectfully submitted,

*/s/ George Pazuniak*

George Pazuniak (DE Bar 478)
O'KELLY & ERNST, LLC
824 N Market St, Ste 1001A
Wilmington, DE 19801 Phone:
(302) 478-4230 Fax: (302)
295-2873 gp@del-iplaw.com

*Of Counsel:*

Timothy J. Haller
HALLER LAW PLLC
230 E Delaware Pl,
Ste 5E Chicago, IL
60611 Phone: (630)
336-4283
haller@haller-iplaw.co
m

***Attorneys for Plaintiff, Internet Media Interactive Corp.***

Document comparison by Workshare 9.5 on Tuesday, May 26, 2020 1:34:59 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\22776\Desktop\Matters\Shopify\Prior Cases\DDE-1-20-cv-00099-1 - Complaint_Unilever.pdf |
| Description | DDE-1-20-cv-00099-1 - Complaint_Unilever |
| Document 2 ID | file://C:\Users\22776\Desktop\Matters\Shopify\Prior Cases\DDE-1-20-cv-00416-1 - Complaint_Shopify.pdf |
| Description | DDE-1-20-cv-00416-1 - Complaint_Shopify |
| Rendering set | GDCv9Rendering |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 43 |
| Deletions | 40 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 83 |

# EXHIBIT 2

Internet Media Interactive Corp. Litigation History from Docket Navigator

**Case Timelines**





| | |
|---|---|
| DDE-1-18-cv-00893 | |
| DDE-1-18-cv-00894 | |
| DDE-1-18-cv-00971 | |
| DDE-1-18-cv-00975 | |
| NDIL-1-18-cv-04579 | |
| WDNY-6-18-cv-06593 | |
| MDFL-6-18-cv-01365 | |
| NDIL-1-18-cv-07138 | |
| NDIL-1-18-cv-07536 | |
| DDE-1-18-cv-01985 | |
| SDNY-1-19-cv-00223 | |
| SDFL-9-19-cv-80169 | |
| NDIL-1-19-cv-01365 | |
| DDE-1-19-cv-00441 | |
| MDFL-2-19-cv-00237 | |
| SDFL-0-19-cv-61171 | |
| SDNY-1-19-cv-05575 | |
| NDIL-1-19-cv-04136 | |
| EDNY-1-19-cv-03662 | |
| NDIL-1-19-cv-05615 | |
| SDNY-1-19-cv-08313 | |
| SDFL-9-19-cv-81282 | |
| SDNY-1-19-cv-09956 | |
| EDNY-1-19-cv-06439 | |
| SDNY-1-19-cv-11199 | |
| DDE-1-20-cv-00099 | |
| MDFL-2-20-cv-00085 | |
| SDNY-1-20-cv-01156 | |
| NDIL-1-20-cv-01014 | |
| DDE-1-20-cv-00416 | |
| SDFL-1-20-cv-21270 | |
| EDVA-1-20-cv-00530 | |
| DDE-1-20-cv-00750 | |
| NDCA-3-20-cv-03706 | |

1/1/2005    2/1/2008    3/1/2011    4/1/2014    5/1/2017    6/3/2020

- ⬜ Case Filing
- 🟨 Claim Construction
- 🟦 Termination
- 🟧 Transfers & Stays




© 2019 Hopkins Bruce Publishers, Corp.

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **INTERNET MEDIA INTERACTIVE CORP.,** | |
| **Plaintiff,** | |
| **v.** | **Case No.:** |
| **DANONE US, INC. (fka THE WHITEWAVE FOODS COMPANY) and DANONE NORTH AMERICA PUBLIC BENEFIT CORPORATION,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Internet Media Interactive Corp. ("Internet Media" or "Plaintiff") complains of Defendants Danone US, Inc. (formerly known as The WhiteWave Foods Company) and Danone North America Public Benefit Corporation (collectively "Danone" or "Defendants") as follows, all upon Plaintiff's best information and belief:

### NATURE OF LAWSUIT

1.      This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

### THE PARTIES

2.      Plaintiff Internet Media Interactive Corp. is a Delaware corporation with its principal place of business at 3511 Silverside Road, Suite 105, Wilmington, Delaware 19810.

3.      Internet Media is the named assignee of, owns all right, title and interest in, and has standing to sue for infringement of United States Patent No. 6,049,835, entitled "System For Providing Easy Access To The World Wide Web Utilizing A Published List Of Preselected

Internet Locations Together With Their Unique Multi-Digit Jump Codes," which issued on April 11, 2000 ("the '835 Patent") (a true and correct copy is attached as Exhibit A).

4.      Internet Media has the exclusive right to enforce and collect all past damages for infringement of the '835 Patent. Internet Media has standing to sue for infringement of the '835 Patent.

5.      Danone US, Inc. ("Danone US") is a Delaware corporation with a registered agent of Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, Delaware 19810 and maintaining its principal place of business at 12002 Airport Way, Broomfield, Colorado 80021. In 2018, The WhiteWave Foods Company ("WhiteWave") formally changed its name to Danone US, Inc.

6.      Danone North America Public Benefit Corporation ("Danone North America") is a Delaware corporation with a registered agent of Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, Delaware 19810 and maintaining its principal place of business at 1 Maple Avenue, White Plains, New York 10605. Danone North America is the parent of Danone US ("WhiteWave is part of a new organization – Danone North America" (see http://www.whitewave.com/)).

7.      Defendants own, provide and operate the website www.myvega.com and related URLs. Defendants also distributes advertisements through various media that instruct recipients to enter a code to redirect to a new location. Specifically, Defendants operate the account "@VegaTeam" on Twitter, found at https://twitter.com/VegaTeam.

## JURISDICTION AND VENUE

8.      Internet Media's claim for patent infringement against Defendants arises under the patent laws of the United States including 35 U.S.C. §§ 271 and 281. Consequently, this Court has

original and exclusive subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.      Defendants own, operate and conduct business in the state of Delaware and direct advertisements at residents of Delaware – which are covered by at least Claim 11 of the '835 Patent – and throughout the United States including Delaware and this judicial district.

10.     Defendants are currently doing business in this judicial district, have purposefully availed themselves of the privilege of conducting business with residents of this judicial district, have purposefully reached out to residents of this judicial district, and have established sufficient minimum contacts with the State of Delaware such that they should reasonably and fairly anticipate being haled into court in Delaware.

11.     Danone US is a Delaware corporation and has a designated agent incident to such registration.

12.     Danone North America is a Delaware corporation and has a designated agent incident to such registration.

13.     Defendants have established sufficient minimum contacts with the State of Delaware such that they should reasonably and fairly anticipate being haled into court in Delaware.

14.     Venue in this judicial district is proper under 28 U.S.C. § 1400(b).

**INFRINGEMENT OF UNITED STATES PATENT NO. 6,049,835**

15.     Defendants have directly infringed the '835 Patent at least through their unauthorized use of the method of Claim 11 for providing automatic access to preselected locations on the Internet. Defendants alone, or based on the actions of other persons/entities attributable to Defendants, satisfied each of the limitations of Claim 11 as follows:

        a.      Defendants have published a compilation of information with respect to preselected Internet locations (*e.g.*, advertisements on Twitter or other online medium). On

January 4, 2009, the Delaware District Court in proceedings related to the '835 Patent construed the similar phrase "a published compilation of preselected Internet locations" to mean "a publicly accessible collection of information which corresponds to preselected Web sites (or to any other type of preselected data found on the Internet) which have unique URL addresses, the URL addresses being associated with diverse individuals or entities." Defendants have published a publicly accessible (*e.g.*, via Twitter or other online medium) collection of information which corresponded to preselected Web sites which have unique URL addresses (*e.g.*, information about a desired Web site destination of interest to a user), the URL addresses having been associated with entities other than Defendants.

b.      Said published compilation – published by Defendants – included a unique predetermined multi-digit jump code assigned to each of said preselected Internet locations for which information is published therein (e.g., shortened codes recognized by ow.ly). On January 4, 2009, the Delaware District Court also construed the phrase "a unique predetermined multi-digit jump code" to mean "a unique predetermined code consisting of more than one number." Defendants' published compilation included unique predetermined multi-digit jump codes consisting of more than one number (e.g., Zyl49).

c.      Defendants have provided – through their publication of compilations of various information on Twitter – a predetermined Internet location having an address published in said published compilation (*e.g.*, ow.ly). On January 4, 2009, the Delaware District Court also construed the similar phrase "a predetermined published Internet location" to mean "a predetermined Web site (or any other type of data found on the Internet); (a) which has a unique URL address included in the published compilation; and (b) which serves to provide access to other preselected Internet locations." The

predetermined Web site published by Defendants (a) had a unique URL address (*e.g.*, ow.ly) included in the published compilation; and (b) which served to provide access to other preselected Internet locations. Said predetermined Internet location – managed by a link shortening service provider (*e.g.*, Hootsuite) – was characterized by means for capturing a desired multi-digit jump code assigned to said preselected Internet location such that a multi-digit jump code could be entered by a user after the predetermined Internet location was accessed.

d.     The user accessed said predetermined Internet location and entered said desired multi-digit jump code into said predetermined Internet location. Specifically, by clicking upon a URL embedded in the published compilation, the user accessed the predetermined Internet location (*e.g.*, ow.ly) and, thereafter, entered the desired multi-digit jump code at said predetermined Internet location (*e.g.*, ow.ly). As presently advised, Defendants are vicariously liable for the user's performance of this step based on (a) Defendants conditioning participation in an activity (*e.g.*, participating in promotional offerings) or receipt of a benefit (*e.g.*, receiving promotional offerings or information of interest) upon the performance of this step – which step is required for the user to reach the new destination of interest; and (b) Defendants establishing the manner or timing of that performance – which, by the nature of the publication and the desired outcome from using the jump code to reach a new destination, necessarily requires performance of this step.

e.     The link shortening service provider (*e.g.*, Hootsuite) received said multi-digit jump code entered into said predetermined Internet location after said multi-digit jump code had been captured at said predetermined Internet location. As presently advised, Defendants are vicariously liable for a third-party link shortening service provider's (*e.g.*,

Hootsuite) performance of this step based on the existence of an agreement (see, https://hootsuite.com/legal/terms#) between Hootsuite and Defendants.

f.     The link shortening service provider (*e.g.*, Hootsuite) converted the received multi-digit jump code to a URL address corresponding to the desired preselected Internet location. As presently advised, Defendants are vicariously liable for a third-party link shortening service provider's (*e.g.*, Hootsuite) performance of this step based on the existence of an agreement (see, https://hootsuite.com/legal/terms#) between Hootsuite and Defendants.

g.     The link shortening service provider (*e.g.*, Hootsuite) automatically accessed said desired preselected Internet location using said URL address corresponding to said desired preselected Internet location corresponding to said received multi-digit jump code.

16.     Defendants have directly infringed at least Claim 11 of the '835 Patent through the performance of all steps of the claimed method under the doctrine set forth in *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015). See also *Travel Sentry, Inc. v. David A. Tropp*, 2016-2386 (Fed. Cir. Dec. 19, 2017). Defendants had the right and ability to stop or limit the infringement, did not do so, and have profited from such infringement.

17.     The acts of infringement of the '835 Patent by Defendants have injured Internet Media, and Internet Media is entitled to recover damages adequate to compensate it for such infringement from Defendants, but, in no event less than a reasonable royalty.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Internet Media Interactive Corp. respectfully requests that this Court enter judgment against Defendants Danone US, Inc. (formerly known as The WhiteWave Foods Company) and Danone North America Public Benefit Corporation and against their

respective subsidiaries, successors, parents, affiliates, officers, directors, agents, servants, employees and all persons in active concert or participation with them, granting the following relief:

      A.      The entry of judgment in favor of Internet Media and against Defendants;

      B.      An award of damages against Defendants adequate to compensate Internet Media for the infringement that has occurred, but in no event less than a reasonable royalty as permitted under 35 U.S.C. § 284, together with prejudgment interest from the date infringement began; and

      C.      Such other relief to which Internet Media is entitled to under law and any other and further relief that this Court or a jury may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues presented in this Complaint.

Dated: June 4, 2020

*Of Counsel:*

Timothy J. Haller
HALLER LAW PLLC
230 E Delaware Pl, Ste 5E
Chicago, IL 60611
Phone: (630) 336-4283
haller@haller-iplaw.com

Respectfully submitted,

*/s/ George Pazuniak*
George Pazuniak (DE Bar 478)
O'KELLY & ERNST, LLC
824 N Market St, Ste 1001A
Wilmington, DE 19801
Phone: (302) 478-4230
Fax: (302) 295-2873
gp@del-iplaw.com

***Attorneys for Plaintiff,***
***Internet Media Interactive Corp.***

# EXHIBIT 4

1   LAW OFFICES OF MARC LIBARLE
    Marc Libarle (*State Bar No. 071678*)
2   ml7006@gmail.com
    1388 Sutter St, Ste 910
3   San Francisco, CA 94109
    Phone: (415) 928-2400
4
    HALLER LAW PLLC
5   Timothy J. Haller (*Pro Hac Vice Pending*)
    haller@haller-iplaw.com
6   230 E Delaware Pl, Ste 5E
    Chicago, IL 60611
7   Phone: (630) 336-4283

8   *Attorneys for Plaintiff*

9
                    **IN THE UNITED STATES DISTRICT COURT**
10               **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11  | **INTERNET MEDIA INTERACTIVE** | Case No. |
12  | **CORP.,** | |
    | | **COMPLAINT FOR PATENT** |
13  | **Plaintiff,** | **INFRINGEMENT** |
    | **v.** | |
14  | | |
15  | **AIRBNB, INC.,** | |
16  | **Defendant.** | |

17        Plaintiff Internet Media Interactive Corp. ("Internet Media" or "Plaintiff") complains of

18  Defendant Airbnb, Inc. ("Airbnb" or "Defendant") as follows, all upon Plaintiff's best information

19  and belief:

20                              **NATURE OF LAWSUIT**

21        1.      This is a claim for patent infringement arising under the patent laws of the United

22  States, Title 35 of the United States Code.

23                               **THE PARTIES**

24        2.      Plaintiff Internet Media Interactive Corp. is a Delaware corporation with its

25  principal place of business at 3511 Silverside Road, Suite 105, Wilmington, Delaware 19810.

26        3.      Internet Media is the named assignee of, owns all right, title and interest in, and has

27  standing to sue for infringement of United States Patent No. 6,049,835, entitled "System For

28  Providing Easy Access To The World Wide Web Utilizing A Published List Of Preselected

COMPLAINT FOR PATENT INFRINGEMENT

Internet Locations Together With Their Unique Multi-Digit Jump Codes," which issued on April 11, 2000 ("the '835 Patent") (a true and correct copy is attached as Exhibit A).

4.    Internet Media has the exclusive right to enforce and collect all past damages for infringement of the '835 Patent. Internet Media has standing to sue for infringement of the '835 Patent.

5.    Airbnb, Inc. is a Delaware corporation with the agent for service of process as Corporation Service Company doing business in California as CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833 and maintaining its principal place of business at 888 Brannan Street, #4, San Francisco, California 94103.

6.    Defendant Airbnb owns, provides and operates the website www.airbnb.com and related URLs. Defendant also distributes advertisements through various media that instruct recipients to enter a code to redirect to a new location. Specifically, Defendant operates the account "@Airbnb" on Twitter, found at https://twitter.com/Airbnb.

## JURISDICTION AND VENUE

7.    Internet Media's claim for patent infringement against Defendant arises under the patent laws of the United States including 35 U.S.C. §§ 271 and 281. Consequently, this Court has original and exclusive subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.    Defendant owns, operates and conducts business in the state of California and directs advertisements at residents of California – which are covered by at least Claim 11 of the '835 Patent – and throughout the United States including California and this judicial district.

9.    Airbnb is currently doing business in this judicial district, has purposefully availed itself of the privilege of conducting business with residents of this judicial district, has purposefully reached out to residents of this judicial district, and has established sufficient minimum contacts with the State of California such that it should reasonably and fairly anticipate being haled into court in California.

10.    Airbnb has registered itself with the California Secretary of State to do business in California and has a designated agent incident to such registration.

COMPLAINT FOR PATENT INFRINGEMENT                                              - 2 -

11.     Airbnb has established sufficient minimum contacts with the State of California such that it should reasonably and fairly anticipate being haled into court in California.

12.     Venue in this judicial district is proper under 28 U.S.C. § 1400(b).

**INFRINGEMENT OF UNITED STATES PATENT NO. 6,049,835**

13.     Defendant has directly infringed the '835 Patent at least through its unauthorized use of the method of Claim 11 for providing automatic access to preselected locations on the Internet. Defendant alone, or based on the actions of other persons/entities attributable to Defendant, satisfied each of the limitations of Claim 11 as follows:

a.     Defendant has published a compilation of information with respect to preselected Internet locations (*e.g.*, advertisements on Twitter or other online medium). On January 4, 2009, the Delaware District Court in proceedings related to the '835 Patent construed the similar phrase "a published compilation of preselected Internet locations" to mean "a publicly accessible collection of information which corresponds to preselected Web sites (or to any other type of preselected data found on the Internet) which have unique URL addresses, the URL addresses being associated with diverse individuals or entities." Defendant has published a publicly accessible (e.g., via Twitter or other online medium) collection of information which corresponded to preselected Web sites which have unique URL addresses (e.g., information about a desired Web site destination of interest to a user), the URL addresses having been associated with entities other than Defendant.

b.     Said published compilation – published by Defendant – included a unique predetermined multi-digit jump code assigned to each of said preselected Internet locations for which information is published therein (e.g., shortened codes recognized by ow.ly). On January 4, 2009, the Delaware District Court also construed the phrase "a unique predetermined multi-digit jump code" to mean "a unique predetermined code consisting of more than one number." Defendant's published compilation included unique predetermined multi-digit jump codes consisting of more than one number (e.g., 3nE7b9).

c.     Defendant has provided – through its publication of compilations of various information on Twitter – a predetermined Internet location having an address published in

COMPLAINT FOR PATENT INFRINGEMENT                                      - 3 -

said published compilation (e.g., ow.ly). On January 4, 2009, the Delaware District Court also construed the similar phrase "a predetermined published Internet location" to mean "a predetermined Web site (or any other type of data found on the Internet); (a) which has a unique URL address included in the published compilation; and (b) which serves to provide access to other preselected Internet locations." The predetermined Web site published by Defendant (a) had a unique URL address (e.g., ow.ly) included in the published compilation; and (b) which served to provide access to other preselected Internet locations. Said predetermined Internet location – managed by a link shortening service provider (e.g., Hootsuite) – was characterized by means for capturing a desired multi-digit jump code assigned to said preselected Internet location such that a multi-digit jump code could be entered by a user after the predetermined Internet location was accessed.

   d.   The user accessed said predetermined Internet location and entered said desired multi-digit jump code into said predetermined Internet location. Specifically, by clicking upon a URL embedded in the published compilation, the user accessed the predetermined Internet location (e.g., ow.ly) and, thereafter, entered the desired multi-digit jump code at said predetermined Internet location (e.g., ow.ly). As presently advised, Defendant is vicariously liable for the user's performance of this step based on (a) Defendant conditioning participation in an activity (e.g., participating in promotional offerings) or receipt of a benefit (e.g., receiving promotional offerings or information of interest) upon the performance of this step – which step is required for the user to reach the new destination of interest; and (b) Defendant establishing the manner or timing of that performance – which, by the nature of the publication and the desired outcome from using the jump code to reach a new destination, necessarily requires performance of this step.

   e.   The link shortening service provider (e.g., Hootsuite) received said multi-digit jump code entered into said predetermined Internet location after said multi-digit jump code had been captured at said predetermined Internet location. As presently advised, Defendant is vicariously liable for a third-party link shortening service provider's (e.g.,

COMPLAINT FOR PATENT INFRINGEMENT                                        - 4 -

Hootsuite) performance of this step based on the existence of an agreement (see, https://hootsuite.com/legal/terms#) between Hootsuite and Defendant.

f.      The link shortening service provider (e.g., Hootsuite) converted the received multi-digit jump code to a URL address corresponding to the desired preselected Internet location. As presently advised, Defendant is vicariously liable for a third-party link shortening service provider's (e.g., Hootsuite) performance of this step based on the existence of an agreement (see, https://hootsuite.com/legal/terms#) between Hootsuite and Defendant.

g.      The link shortening service provider (e.g., Hootsuite) automatically accessed said desired preselected Internet location using said URL address corresponding to said desired preselected Internet location corresponding to said received multi-digit jump code.

14.     Defendant has directly infringed at least Claim 11 of the '835 Patent through the performance of all steps of the claimed method under the doctrine set forth in *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015). See also *Travel Sentry, Inc. v. David A. Tropp*, 2016-2386 (Fed. Cir. Dec. 19, 2017). Defendant had the right and ability to stop or limit the infringement, did not do so, and has profited from such infringement.

15.     The acts of infringement of the '835 Patent by Defendant have injured Internet Media, and Internet Media is entitled to recover damages adequate to compensate it for such infringement from Defendant, but, in no event less than a reasonable royalty.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Internet Media Interactive Corp. respectfully requests that this Court enter judgment against Defendant Airbnb, Inc. and against its respective subsidiaries, successors, parents, affiliates, officers, directors, agents, servants, employees and all persons in active concert or participation with it, granting the following relief:

A.      The entry of judgment in favor of Internet Media and against Defendant;

COMPLAINT FOR PATENT INFRINGEMENT                                    - 5 -

B.      An award of damages against Defendant adequate to compensate Internet Media for the infringement that has occurred, but in no event less than a reasonable royalty as permitted under 35 U.S.C. § 284, together with prejudgment interest from the date infringement began; and

C.      Such other relief to which Internet Media is entitled to under law and any other and further relief that this Court or a jury may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues presented in this Complaint.

June 4, 2020                                        Respectfully Submitted:

                                                   */s/ Marc Libarle*
                                                   LAW OFFICES OF MARC LIBARLE
                                                   Marc Libarle (*State Bar No. 071678*)
                                                   1388 Sutter St, Ste 910
                                                   San Francisco, CA 94109
                                                   Phone: (415) 928-2400
                                                   ml7006@gmail.com

                                                   HALLER LAW PLLC
                                                   Timothy J. Haller (*Pro Hac Vice Pending*)
                                                   haller@haller-iplaw.com

                                                   *Attorneys for Plaintiff*

# EXHIBIT A

## TO

## COMPLAINT FOR PATENT INFRINGEMENT

US006049835A

# United States Patent [19]

## Gagnon

[11] **Patent Number:** **6,049,835**

[45] **Date of Patent:** **Apr. 11, 2000**

[54] **SYSTEM FOR PROVIDING EASY ACCESS TO THE WORLD WIDE WEB UTILIZING A PUBLISHED LIST OF PRESELECTED INTERNET LOCATIONS TOGETHER WITH THEIR UNIQUE MULTI-DIGIT JUMP CODES**

[75] Inventor: **Eric F. Gagnon**, Brooklyn, N.Y.

[73] Assignee: **Internet Media Corporation**, Brooklyn, N.Y.

[21] Appl. No.: **08/705,967**

[22] Filed: **Aug. 30, 1996**

[51] **Int. Cl.**[7] .............................................. **G06F 15/16**

[52] **U.S. Cl.** .............................................. **709/245**; 709/227

[58] **Field of Search** .................................. 348/27, 8, 13; 386/83; 709/218, 229, 219, 245, 227; 345/335; 707/3; 235/375

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,706,121 | 11/1987 | Young | 348/27 |
| 5,526,127 | 6/1996 | Yonetani et al. | 386/83 |
| 5,572,643 | 11/1996 | Judson | 709/218 |
| 5,612,730 | 3/1997 | Lewis | 348/8 |
| 5,625,781 | 4/1997 | Cline et al. | 345/335 |
| 5,659,729 | 8/1997 | Nielsen | 707/3 |
| 5,694,163 | 12/1997 | Harrison | 348/13 |
| 5,708,780 | 1/1998 | Levergood et al. | 709/229 |
| 5,764,906 | 6/1998 | Edelstein et al. | 709/219 |
| 5,804,803 | 9/1998 | Cragun et al. | 235/375 |

*Primary Examiner*—Albert De Cady
*Assistant Examiner*—David Ton
*Attorney, Agent, or Firm*—Blank Rome Comisky & McCauley LLP

[57] **ABSTRACT**

A system for quickly and easily accessing preselected desired addresses or URLs on the Internet is disclosed in which a published list of Internet or World Wide Web sites together with their unique jump codes is utilized in connection with a corresponding specialized Web site which is accessed by a user using either a personal computer or a TV Internet Terminal and remote control, after which access a jump code corresponding to the preselected desired URL is entered by the user and software contained in the specialized Web site immediately and automatically accesses the desired Web site.

**20 Claims, 1 Drawing Sheet**



**U.S. Patent**   Apr. 11, 2000   **6,049,835**



FIG. 1



FIG. 2

6,049,835

**1**

SYSTEM FOR PROVIDING EASY ACCESS
TO THE WORLD WIDE WEB UTILIZING A
PUBLISHED LIST OF PRESELECTED
INTERNET LOCATIONS TOGETHER WITH
THEIR UNIQUE MULTI-DIGIT JUMP CODES

## BACKGROUND OF THE INVENTION

The present invention is directed to a system for providing users of the Internet with easy access to the World Wide Web. More particularly, the present invention is directed to providing a central location which World Wide Web users of the Internet can reach and can then instruct to provide them with ready access to a particular location on the World Wide Web portion of the Internet.

Use of the Internet, a worldwide network of more than 100,00 individual computer networks and over 50 million users, has been gaining in popularity in the last several years. At the present time, almost every large corporation, university, government, organization, and many businesses around the world are connected to and have access to the worldwide network known as the Internet. The Internet is a collection of individual computer networks which are connected to each other by means of high-speed telephone and satellite data links, and which are all connected by a public-domain communications software standard.

The Internet was developed in the late 1960s, when it was established by the United States Defense Department as a research project for use by defense contractors and universities. The purpose of the Internet at that time was to create a military computer network which could still function reliably if any parts of it were destroyed in a nuclear war. A series of standardized communications protocols for sending information around the computer network were developed in order to ensure against the inherent unreliability of telephone lines and exposed telephone switching stations.

For over 25 years, the Internet was used primarily as a research-oriented computer communications network for universities, defense contractors, governments, and organizations in science and academia. During those years, it grew slowly but steadily and its proven freely, available communications protocols were also adopted by the computer and telecommunications industries and by large corporations, who used the Internet for electronic mail communications between and among their companies. In 1992, the United States Government turned over operation of the Internet's high-speed data links to commercial communications networks. That transfer, as well as the concurrent explosion in the use of personal computers, local area networks, bulletin boards systems, and consumer-oriented online services, caused the Internet to grow tremendously. Because of the convergence of those events, a critical mass for acceptance of the Internet as a standard means for the worldwide connection of individual computer networks of all kinds and sizes was created.

One of the reasons for the explosive growth of the Internet, which is growing at an estimated rate of 15%–20% per month, is the widespread acceptance of the Internet as the standard for electronic mail. The Internet is also well known for its two other main features, its usenet newsgroups, which constitute thousands of on-line discussion groups covering a wide variety of business, personal, and technical subjects, and the latest Internet phenomenon, the World Wide Web.

The World Wide Web or Web, as it is more commonly known, is a standardized method of combining the display of graphics, text, video and audio clips, as well as other

**2**

features, such as secure credit card transactions, into a standardized, graphical, friendly interface that is easy for anyone to use. That is in contrast to the use of the Internet for electronic mail, which primarily consists of rapid text-based communications among one or more individuals.

The Web was designed by a British scientist in 1991 as a way to let researchers easily swap images instead of just messages. The creation of the first point-and-click software for "browsing" the Web, known as Mosaic, by the University of Illinois, enabled ready access to the Web by non-technically skilled users. Then, commercial companies, such as Netscape Communications Corporation, developed more sophisticated Web browsers, such as Netscape's Navigator. Another Web browser is the recently introduced Explorer 3.0 from Microsoft Corporation. Web browsers are also provided by well-known major on-line computer services such as Compuserve, American On-line, Prodigy, MCI and Netcom. Recently, Microsoft's Windows 95 operating system was introduced, which also includes its own Web browser.

The standard protocols which define the Web work in combination with a Web browser which runs on personal computers and handles the chores of accessing and displaying graphics and texts, and playing back video and audio files found on the Web. In addition to providing Web access, Web browsers and the Web tie together all the Internet's other useful features that existed before the advent of the Web, such as the newsgroups, FTP text file access, access to the net's Gopher sites, and, of course, sending or receiving electronic mail.

The World Wide Web standards are essentially a text coding, or "mark-up" method, where selected elements in a text file, such as article headlines, subheads, images and important words highlighted in the body of a text file can, by the insertion of special, bracketed codes (called HTML or Hyper Text Mark-up Language codes), be turned into hot links that are easily and instantly accessible by anyone with a Web browser.

The World Wide Web is considered by many to be the true information superhighway. It lays the foundation for the use of the Internet as an entirely new broadcast medium, one which provides individuals, groups, and companies with unprecedented new opportunities for broadcast communication. For example, it is now fairly easy to create one's own Web site or address on the Web such that all users on the Internet can reach it The Web thus provides an outlet for anyone who desires to self-publish articles, graphics, video clips, and audio files over the net. Since any individual Web site can be freely accessed by anyone else with Web access, anyone who creates a Web site has a form for broadcasting their information, news, announcements, or creative works to an audience of millions. In addition, communication by Internet electronic mail can be established by any member of this audience with the author of a Web site, thus providing a new level of two-way communication to this new broadcast medium.

Because the Web provides several key benefits for Internet users, those benefits are encouraging the explosive growth of the Web and, ultimately, the acceptance of the Internet as the world's de facto computer communications medium.

First, using the Web, is simplicity itself. Compared to the confusing Unix based commands which were required to use the Internet just a few years ago, using a Web browser provides the user with the same friendly, graphical point-and-click access to all the Internet's features that the users

6,049,835

**3**

have come to expect from any good stand-alone Windows commercial software product. Once a user has accessed the Web, any of the 100,000 or more Web sites and their linked articles, text articles, graphic images, video/audio clips, extensive software libraries, and communications features are easily accessible with a click of the user's mouse key. In addition, any good Web browser software also opens up the Web's multimedia potential by providing users with instant and automatic access to helper applications software that automatically plays video and sound clips. Such multimedia potential has become a big attraction on the Web.

Web browsers also have a bookmark or hot list feature, which allows the user to capture and save the location of any Web site that is visited, so that such sites can be readily reaccessed by clicking on it from the user's Web browser at any time.

Using the Web, users can get instant access to many types of information, entertainment, and inter-active resources which are now available on the Web. Because of the explosion of newly created Web sites, the user can get access to useful, practical information on an almost infinite variety of subjects. The Web also provides an instant connection to millions of other people on the Internet. The resources which may be found on the Web are almost limitless.

In order to understand the use and operation of the Web, it is believed that certain terms that will be used herein should be defined. A Web browser, as previously discussed, is a graphical, Windows-based software program which is used on a personal computer to access the Web. A Web site or Web page describes an individual's "place" on the Web containing a single Web-published feature. A Web site is basically a collection of files located under a directory somewhere on someone's computer connected to the Internet. A Web site may consist of one Web page or of many Web pages, and usually also includes onscreen graphics, pictures, texts and video and audio clips, or an archive of software that can be downloaded, stored and used freely on the visitor's own personal computer.

Frequently, Web pages utilize links or hot links, two terms which are used interchangeably, to describe words or groups of words which are highlighted on Web pages. When a visitor clicks on a link with his mouse, he is immediately linked to another Web site or location on the current Web site containing the information that is referred to by the link. Any single Web site may contain dozens, hundreds, or even thousands of hot links, both to other sections within the same site or to other Web sites located anywhere else in the world.

Some Web pages also include a links page or jump site which consists of lists of links to many other Web sites. These are often a Web site author's favorite sites or feature links to Web sites pertaining to a specific subject.

Every Web site has an exact address, or location on the Web. Such addresses are known as a Uniform Resource Locator or URL. URLs consist of a confusing string of subdirectories, files or executable commands, separated by slashes, which are extremely difficult to work with and which must be typed into the user's Web browser exactly as they appear, including the use of upper and lower-case letters, in order to go to a Web site. While clicking on hot links will get the user to a Web site without having to type in a URL or copying a URL from a text file (if it is located on the user's computer) and pasting it into the user's Web browser-screen can save the user from this arduous task, the use of URLs has become the bane of the use of the Web.

Another difficulty with accessing the 100,000 or more individual Web sites is that many of them do not offer any

**4**

truly useful information or other benefits. In addition, there are many Web sites which consist of nothing more than lists of links to other Web sites, which often do nothing more than link the visitor to a Web site to other useless Web link pages. Skimming along such pages can be a frustrating and information starving experience, and one which should hopefully be avoided. Thus, while in general, the Web makes everything on the Internet easy to find and access, there is a need for a directory of the well-thought out and useful sites, coupled with a way to easily and quickly access such sites in order for users to get the most from their Web experience as well as experiencing the best the Web has to offer. More particularly, given the 100,000 plus Web sites that exist at that the present time, with many more being added every day, there is a need for a system which the Web user can use to access Web sites which contain a substantial amount of original information, graphics, or multi-media, provide useful advice, news or entertainment, and present the information in a well-thought out and professional manner. Most importantly, there is a great need to provide Web users with a system for accessing such Web pages in an easy to use, automatic, and efficient manner.

SUMMARY AND OBJECTS OF THE
INVENTION

In light of the above-described drawbacks of accessing the World Wide Web, it is clear that there is still a need in the art for a system for quickly and easily accessing selected beneficial sites or addresses on the World Wide Web portion of the Internet.

Therefore, it is a primary object of the present invention to provide a system by which user's of the World Wide Web portion of the Internet can readily access preselected Web sites or Internet addresses, after they have gained access to the World Wide Web portion of the Internet. More particularly, it is an object of the present invention to provide a specialized Web site which can be used in conjunction with published jump codes to readily and automatically access other Web sites or Internet locations, without the user having to remember or input the URL of the desired Web site.

Even more particularly, it is an object of the present invention to provide a printed publication containing descriptions of selected Web sites or addresses together with jump codes therefor which can readily be used in conjunction with a specialized Web site which includes software which, upon recognizing the inputted jump code, quickly and automatically accesses the desired Web site.

It is a further object of the present invention to be able to use the system of the present invention with any one of personal computers connected to the Web, Television Internet Terminal devices, or any other electronic device which can be used for Internet access.

The system of the present invention utilizes a published list of preselected Web sites, which are selected according to predetermined criteria, such as content, usefulness, presentation, and authorship. Each of the selected Web sites is assigned a specific four-digit jump code. A user desiring to access one of the preselected Web sites first gains access to the World Wide Web, using a Web browser, by accessing a special Web site which contains software for receiving any of the published four-digit jump codes and, based upon the stored relationship of the URLs corresponding to the input jump code, directly accesses the Web site corresponding to the jump code inputted by the user.

In the case of so-called "set top" TV Internet Terminals, such as those soon to be available from Sony and Phillips,

6,049,835

5                        6

the user accesses the specialized Web site using the TV Internet Terminal and then enters the desired jump codes using a remote control which is similar to a standard television channel selector. In that manner, users with the TV Internet Terminal will be able to access the desired Web sites using their television, the TV Internet Terminal, and the remote control push buttons.

With these and other objects, advantages and features of the invention that may become hereinafter apparent, the nature of the invention may be more clearly understood by reference to the following detailed description of the invention, the appended claims and to the several drawings attached herein.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows, in schematic block diagram form, the inventive system of the present invention for use in connection with personal computer access to the Internet; and

FIG. 2 shows the system of the present invention for use with television Internet terminal access to the Internet.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to the figures, wherein like reference numerals designate like elements throughout, there is shown in FIG. 1 the system of the present invention for use in connecting to the Internet by means of a personal computer. A personal computer 100, having a Web browser, is connected by means of a modem 136 by means of a telephone line or other communications medium, to a server computer 106 which provides access for the personal computer 100 directly to the Internet. The personal computer 100 includes a video monitor 102, as well as a keyboard 104 and a pointing device, such as a mouse or track ball, 105. Once the user has connected to the Internet, he accesses the specialized Web site 108, by entering the URL for that Web site. The specialized Web site is preferably a Web site called JumpCity, which has a URL of http://www.jumpcity.com/, although, obviously a specialized Web site for use as part of the inventive system disclosed herein could have any URL (and indeed would, of necessity, have to have its own URL), the only requirement being that the URL be disseminated in conjunction with the dissemination of the jump codes to be used therewith.

The JumpCity Web site 108 contains software which is capable of accepting a four-digit jump code, looking up the corresponding URL for the Web site denoted by that jump code in a stored data base, and then for immediately and automatically accessing that URL or Web site.

In order to provide Web users with the jump codes, it is preferable that a printed publication which contains preselected Web sites based on certain criteria be disseminated so that the jump codes associated with each of the preselected Web sites can be easily determined by the users. Such a publication, entitled "What's on the Web" published by Internet Media Corporation is one such type of book which is fully integrated with the specialized Web site 108. Such a book 110 contains a plurality of reviews of Web sites 112, 114, 116, 118, 120, and 122, each of which has a corresponding four digit jump code 124, 126, 128, 130, 132, and 134, associated therewith. After the user is on-line with the specialized JumpCity Web site 108, entering the four digit jump code will instantly link the Web site corresponding thereto to the JumpCity Web site, thus providing immediate access to the desired Web site for the user. There is no need to determine, nor input, the URL or address of the Web site which is desired to be accessed.

As discussed above, in addition to Web sites, any other type of subject matter contained on the Internet which has a URL, can be accessed using the jump code provided therefor. An example of such an additional use is the accessing of newsgroups, or Usenet Internet discussion newsgroups, where on-line discussions on thousands of subjects can be attained. Such newsgroups can also be accessed by means of the specialized JumpCity Web site 108. A listing of such newsgroups together with their assigned jump codes can be accomplished in a manner similar to that for the Web sites.

In addition to publishing a preselected number of descriptions and/or reviews of various Web sites 112–122 with their assigned jump codes 124–134 in a printed publication or book 110, the specialized JumpCity Web site 108 can also contain such reviews and their accompanying jump codes. In that matter, instant Web access to each of the reviews in the book 110, plus the latest news and reviews of the latest and best Web sites, updated, for example, daily, can be provided for users who access the specialized JumpCity Web site 108. In addition, without having to enter the URLs for accessing the preselected Web sites, users, after having access to the JumpCity Web site 108 and visiting other Web sites, can provide comments on the Web sites visited, vote on their favorite Web sites, and also participate in on-line discussions concerning those Web sites.

The preselected Web sites (over 1800 of which are covered in the "What's on the Web" book 110), are selected based upon four criteria. The first criteria is the content of the Web site. The selected Web sites preferably contain a substantial amount of original information, graphics and multimedia. The information contained in the selected Web sites is preferably comparable in value and amount to information that is available from traditional, professionally created media, such as newspapers and magazines. Also, it is preferable that the information available on the selected Web sites be updated on a reasonably frequent basis.

The second criteria is the usefulness of the information on the preselected Web sites. For example, it is preferable that the information available at the selected Web sites provide advice, news, and entertainment value. In addition, it is desirable that the information be useful to the Web reader to solve a problem.

The third criteria for selecting Web sites which are assigned jump codes is whether the site has good design and production values, that is, whether the graphics used by the site are interesting, professional-looking, and appropriate from the standpoint of Web design.

The fourth criteria used to preselect Web sites which are then assigned jump codes for use with the integrated specialized JumpCity Web site 108 and the Internet access system of the present invention is the authorship of the Web site. Preferably, the authors of the Web site are known and are highly knowledgeable concerning the information they are disseminating.

In order to use the Internet access system of the present invention, as discussed above, the user first must access the JumpCity specialized Web site 108 which is maintained for exclusive use in connection with the publication 110 which contains the preselected and reviewed Web sites 112–122 and their corresponding jump codes 124–134. The only URL the user need ever input in order to access any of the preselected (and best available) Web sites in the publication 110 is the URL of the JumpCity Web site 108. After the JumpCity Web site 108 has been accessed, the user enters the four-digit jump code (obviously a larger number of digits could be utilized in order to enable the accessing of a larger

6,049,835

7

number of Web sites or newsgroups or other URL locations on the Internet) which corresponds to the selected Web site or newsgroup or other address the user desires to access. The code is entered in a standard on-screen HTML box or form which is then read by software resident on the JumpCity specialized Web site **108**. This software program searches through its database of URLs, and finds the URL which is linked to the input jump code. The software then links the user either directly to the desired Web site, or alternatively, first to a brief written review of the Web site. By entering a simple four-digit code, the user is much more easily and conveniently able to access the desired Web sites, as compared to the standard method of accessing those Web sites, which requires the error-prone, tedious and confusing entry of URLs. The use of the jump codes printed in the printed publication or book **110** combined with the integrated specialized Web site **108** provides Web users with the fastest possible way of reaching the reviewed (and best) Web sites available on the World Wide Web portion of the Internet.

Referring now to FIG. **2**, there is shown the system of the present invention for use with an alternative Internet access hardware and software. Specifically, a set-top TV Internet Terminal **202**, such as that available from Sony or Philips, which uses software and hardware available from WebTV Networks, Inc., of Palo Alto, Calif., and known as a "Web TV Internet Terminal" is utilized, in connection with a standard broadcast television **200**. The TV Internet Terminal **202** is connected to the television **200** such that the television functions in the same manner as the video monitor **102**, that is, it displays the computer video generated by the TV Internet Terminal **202**. The TV Internet Terminal **202**, in addition to containing the necessary hardware and software for enabling the television **200** to display computer video, is connected by means of a modem **136** which may also preferably be a cable modem, through a telecommunications medium, such as a telephone line, cable system line **138** or other medium, such as by satellite, to the server **106** of the Internet access provider. From there the user is able to access the server on which the JumpCity Web site **108** resides, using the Internet.

The users of the TV Internet Terminal accessing hardware are likewise provided with a book **110** which contains the same information discussed above in connection with FIG. **1**.

In order to access the selected Web sites contained and reviewed in the book **110**, the users of the TV Internet Terminal are provided with a remote control device **204**, which has an outward appearance similar to a standard television channel changer but which is designed to work in connection with the TV Internet Terminal **202**. For that purpose, a plurality of specialized push buttons **206–216** are provided so that the TV Internet Terminal **202** can be commanded to access the Internet. In particular, in order to access the JumpCity Web site **108**, one of the specialized buttons **206–216** may be a specialized function button which causes the TV Internet Terminal **202** to transmit the URL of the JumpCity Web site **108**. Alternatively, the remote control **204** can contain enough push buttons to enable the user to enter the URL using the push buttons **206–216**. After the user has accessed the JumpCity Web site **108**, a jump code is entered followed by the depression of a specialized function key, similar to the enter key of the keyboard **104**. In all other respects, accessing the desired Web site as published in the book or printed publication **110** or as published as an on-line list within the JumpCity Web site **108**, is the same as described above in connection with FIG. **1**. Obviously, the design of such a remote control **204** with

8

specialized push buttons and function buttons as well as the TV Internet Terminal **202**, will be known to those of ordinary skill in the art.

Although only a preferred embodiment is specifically illustrated and described herein, it will be appreciated that many modifications and variations of the present invention are possible in light of the above teachings and within the purview of the appended claims without departing from the spirit and intended scope of the invention.

What is claimed is:

**1**. A system for providing automatic access to preselected locations on the Internet, comprising:

a published compilation of preselected Internet locations, said published compilation including a unique predetermined multi-digit jump code assigned to each of said preselected Internet locations published therein;

a predetermined published Internet location having an address published in said published compilation, said predetermined published Internet location including means for capturing a desired multi-digit jump code assigned to each preselected Internet location after said multi-digit jump code has been entered by a user after accessing said predetermined published Internet location;

means for accessing said predetermined published Internet location;

means for receiving said desired multi-digit jump code from said means for capturing and means for converting said received multi-digit jump code to a URL address corresponding to the desired preselected Internet location; and

means for automatically accessing said desired preselected Internet location using said URL address corresponding to said desired preselected Internet location, whereby said user need only enter said desired multi-digit jump code to access a desired preselected Internet location without having to enter said corresponding URL address.

**2**. The system of claim **1**, wherein said means for accessing said preselected published Internet location comprises a personal computer.

**3**. The system of claim **1**, wherein said means for accessing said preselected published Internet location comprises a television Internet device.

**4**. The system of claim **3**, wherein said television Internet device comprises a remote control device having a plurality of push buttons for controlling said television Internet device.

**5**. The system of claim **1**, wherein said preselected locations on the Internet are in the World Wide Web.

**6**. The system of claim **1**, wherein said published compilation of preselected Internet locations is published as printed matter.

**7**. The system of claim **1**, wherein said published compilation of preselected Internet locations is published on-line in said predetermined published Internet location on the Internet.

**8**. The system of claim **1**, wherein said means for capturing a desired multi-digit jump code entered by a user after accessing said predetermined Internet location comprises an on-screen HTML form.

**9**. The system of claim **1**, wherein said multi-digit jump code is a four digit number.

**10**. The system of claim **1**, wherein said published compilation comprises a review of each of said preselected Internet locations.

6,049,835

9

**11**. A method for providing automatic access to prese-
lected locations on the Internet, comprising the steps of:

publishing a compilation of preselected Internet locations,
said published compilation including a unique prede-
termined multi-digit jump code assigned to each of said
preselected Internet locations published therein;

providing a predetermined Internet location having an
address published in said published compilation, said
predetermined Internet location comprising means for
capturing a desired multi-digit jump code assigned to
said preselected Internet location, said desired multi-
digit jump code being entered by a user after said
predetermined Internet location has been accessed;

accessing said predetermined Internet location and enter-
ing said desired multi-digit jump code into said prede-
termined Internet location;

receiving said multi-digit jump code entered into said
predetermined Internet location after said multi-digit
jump code has been captured at said predetermined
Internet location;

converting the received multi-digit jump code to a URL
address corresponding to the desired preselected Inter-
net location; and

automatically accessing said desired preselected Internet
location using said URL address corresponding to said
desired preselected Internet location corresponding to
said received multi-digit jump code.

10

**12**. The method of claim **11**, wherein said step of access-
ing said predetermined Internet location comprises using a
personal computer to enter said multi-digit jump code.

**13**. The method of claim **11**, wherein said step of access-
ing said predetermined Internet location comprises using a
television Internet device.

**14**. The system of claim **13**, wherein said television
Internet device comprises a remote control device having a
plurality of push buttons for controlling said television
Internet device.

**15**. The method of claim **11** wherein said preselected
locations on the Internet are on the World Wide Web.

**16**. The method of claim **11**, wherein said step of pub-
lishing a compilation of preselected Internet locations com-
prises publishing said compilation as printed matter.

**17**. The method of claim **11**, wherein said step of pub-
lishing a compilation of preselected Internet locations com-
prises publishing said compilation on-line in said predeter-
mined Internet location.

**18**. The method of claim **11**, wherein said means for
capturing a desired multi-digit jump code entered by a user
after accessing said predetermined Internet location com-
prises an on-screen HTML form.

**19**. The method of claim **11**, wherein said multi-digit jump
code is a four digit number.

**20**. The method of claim **11**, wherein said published
compilation comprises a review of each of said preselected
Internet locations.

\* \* \* \* \*